**ALASKA FACTORY TRAWLER ASSOCIATION, et al., Plaintiffs/Appellants,**

v.

**Malcolm BALDRIDGE, Secretary of Commerce, Defendant/Appellee,**

and

**Fishing Vessel Owners' Association, et al., Intervenor–Defendants/Appellees.**

No. 86–4410.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 10, 1987.

Decided Nov. 6, 1987.

Stephen B. Johnson, Seattle, Wash., for appellants Alaska Factory Trawler Ass'n, et al.

William B. Lazarus, Washington, D.C., for appellee Baldridge.

Allan A. Tuttle, Washington, D.C., for intervenor-appellees Fishing Vessel Owners' Ass'n, et al.

Before KENNEDY and BEEZER, Circuit Judges, and GRAY,[*] District Judge.

PER CURIAM:

The plaintiffs/appellants are an association of trawl fishermen in the Gulf of Alaska sablefish industry. The defendant/appellee is the acting Secretary of Commerce,[**] and the intervenor-defendants/appellees represent the interests of the longline fishing industry in the Gulf of Alaska.

The plaintiffs/appellants sought in the United States District Court a summary judgment that would render null and void Amendment 14 to the Gulf of Alaska Groundfish Fishing Management Plan and its implementing regulations, and would enjoin the defendant from enforcing the latter. Judge Voorhees denied the plaintiffs' motion and, instead, granted summary judgment motions made by the defendants.

Judge Voorhees very carefully and fully set forth his analysis of the facts and his legal conclusions therefrom in an Order dated August 28, 1986, a copy of which we append hereto. We are in complete agreement with Judge Voorhees' decision, and we do not see how we can improve upon his articulation of it. We accordingly adopt his opinion as our own, summarize briefly the

---

[*] Honorable William P. Gray, Senior United States District Judge for the Central District of California, sitting by designation.

[**] Malcolm Baldridge, the former Secretary of Commerce, died during the pendency of this appeal.

principal holdings, and affirm the decision below.

## STANDARD OF REVIEW

■ A court, acting under authority granted by the Magnuson Fishery Conservation and Management Act (FCMA), may review regulations promulgated by the Secretary of Commerce, and the FCMA provides for the standard of judicial review in this case. 16 U.S.C. § 1855(d). However, unless the Secretary acts in an arbitrary and capricious manner in promulgating such regulations, they may not be declared invalid. Section 1855(d); 5 U.S.C. § 706(2)(A).

## THE SECRETARY'S DECISION

■ In order for a court to overturn a Secretary's decision, it must be shown that alleged irregularities, such as closed mealtime meetings, affected such decision. The trial court found, and we agree, that the alleged irregularities did not result in any improper material being added to the administrative record. In this case the Secretary followed procedures correctly and established a rational basis for his decision.

■ Amendment 14 of the Gulf of Alaska Groundfish Fishing Plan does not violate National Standard 4, 16 U.S.C. § 1851(a)(4), because it will benefit all longline fishermen, not just those that are residents of Alaska. Even though there may be some discriminatory impact from Amendment 14, the regulations satisfy the requirements of National Standard 4 in that they are tailored to solve a gear conflict problem and to promote the conservation of sablefish. Hence, the Secretary's decision to adopt Amendment 14 was not arbitrary and capricious.

The record shows that the Secretary considered several non-economic objectives in promulgating the regulations and that the measure was not adopted solely for economic reasons. In consequence, the Secretary could reasonably conclude that Amendment 14 does not violate National Standard 5, 16 U.S.C. § 1851(a)(5).

■ The Secretary does not have to conduct a formal cost/benefit analysis of Amendment 14. He, therefore, does not need to demonstrate that it is the least restrictive alternative available for managing the sablefish resource. The Secretary could reasonably have concluded from the record that pot and trawl fishing should be curtailed in Alaska for both sociological and environmental reasons, and that the amendment would be beneficial to the nation as a whole, even though some interest groups might be harmed. Thus, National Standard 7 has not been violated. 16 U.S.C. § 1851(a)(7); 50 C.F.R. § 602.17(d).

■ Finally, the Secretary did not violate the National Environmental Policy Act by not requiring the filing of an Environmental Impact Statement (EIS) on the effects of Amendment 14 on the human environment. When substantial questions are raised as to whether a project may cause significant degradation of the environment, an EIS must be prepared, *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 986 (9th Cir.1985). However, an agency's decision not to prepare an EIS should be upheld if it is reasonable. *Foundation of North American Wild Sheep v. Department of Agriculture,* 681 F.2d 1172, 1177 (9th Cir.1982). Since Amendment 14 does not close a highly-worked fishery to all fishermen, but rather allocates the already established optimum yield of sablefish among the existing gear fleets, the decision not to file an EIS was reasonable.

## APPENDIX

Alaska Trawler Association, et al., Plaintiffs,

v.

Malcolm Baldridge, Secretary of Commerce, Defendant,

and

Fishing Vessel Owners' Association, et al., Intervenor–Defendants.

No. C85–2279V

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON

Filed August 28, 1986

### ORDER

Having considered the plaintiffs' motion for partial summary judgment, the defendant's motion for summary judgment, the intervenor-defendants' motion for summary

judgment, and the *amicus curiae* memorandum filed by Senator Ted Stevens of Alaska, the memoranda and affidavits submitted by counsel, the administrative record on file with the Court, and the arguments of counsel at the hearing on these motions, the Court finds and rules as follows:

1. This case involves challenges to an administrative regulation promulgated by the Secretary of Commerce and the National Oceanic and Atmospheric Administration ("NOAA"). The regulation at issue appears in final form in 50 Fed.Reg. 43193 (October 24, 1985) and is codified at 50 C.F.R. Part 672. This regulation was adopted as an amendment to the Gulf of Alaska Groundfish Fishery Management Plan and is referred to as "Amendment 14." Plaintiffs now move for summary judgment on fourteen of their specific challenges to Amendment 14. Defendants and intervenor-devendants have filed cross-motions for summary judgment on those challenges.

2. The portion of Amendment 14 at issue in these motions concerns the allocation of the sablefish optimum yield ("OY") in the Gulf of Alaska among fishermen using various methods of fishing for groundfish. The fishermen who harvest sablefish in the Gulf of Alaska use three kinds of gear: longline gear, pot gear, and trawl gear. Plaintiffs in this case are identified with interests in the pot fishing and trawl fishing industries. The intervenor-defendants represent the interests of the longline fishing industry.

3. Historically, the Gulf of Alaska sablefish fishery was worked primarily by foreign fishermen from Japan, the Soviet Union, and Korea. Since the adoption of the Fishery Conservation and Management Act ("FCMA") in 1976, however, the American share of the sablefish harvest has grown steadily. The Americanization of the fishery has seen a growth in trawl and pot fishing for sablefish. This growth has been at the expense of longline interests.

4. For several years the North Pacific Fishery Management Council ("the Council"), the body responsible for overseeing the development of the Gulf of Alaska Groundfish Fishery Management Plan, had received requests from longline fishermen for the Council to regulate the amount of sablefish that could be caught by trawlers and by pot fishers. In late 1984 and early 1985, the Council received letters from longliners regarding gear conflict and grounds preemption in the sablefish fishery.

5. With reference to pot fishermen, the longliners asserted that pots were often lost and left to rest on the ocean floor and that subsequent activity by longliners in the area of the lost pots would result in their lines becoming entangled in the pots. This entanglement would cause the longliners to lose both their catch and their gear.

6. With reference to the trawl fishermen, the longliners complained that trawling for any groundfish resulted in a large incidental catch of sablefish. As a result, a high percentage of the sablefish OY was being captured by trawlers who were not in fact targeting that species. The activity of the trawlers caused the sablefish fishery to be closed before the longliners could make maximum use of their equipment.

7. In response to a request by the Alaska Longline Fishermen's Association, the Council considered taking emergency action regarding the closure of the Eastern Gulf of Alaska sablefish fishery to all but longline fishermen. In preparation for its February, 1985, meeting, the Council directed its Scientific and Statistical Committee ("SSC") and its Advisory Panel ("AP") to consider the longline fishermen's proposal. Before the February meeting, the SSC filed its report and concluded that further information on the participation by the various gear types in the fishery was needed before the SSC could recommend any action. The AP, however, expressed concern that sablefish could develop into a halibut style fishery where the OY is taken in a short period of time, creating cold storage problems. As a result of this concern, the AP recommended that the Council take some action to close part of the fishery.

8. The Council conducted its public meeting in Sitka, Alaska, on February 5–8,

1985. Throughout the course of this meeting, many members of the public stated their concerns regarding the closure of the Eastern Gulf of Alaska sablefish fishery to all but longliners. The minutes of the meeting indicate that many different viewpoints were presented to the Council both by individuals who supported the proposed emergency regulation and by those who opposed it. At the end of the February meeting, the Council adopted a resolution requesting NOAA to promulgate an emergency regulation that would close the Eastern Gulf of Alaska sablefish fishery to all but longliners.

9. During the week of the February meeting, the Governor of Alaska contacted the Council chairman to express his strong support for the emergency regulation. The Council chairman communicated the Governor's position to the other members of the Council.

10. On the days of the public meetings, the Council was in the habit of taking meals together. These meals were attended only by Council members and by certain invited guests. The meals were not open to the public. During the February meeting, the Council met for breakfast on February 6 and February 8, and for lunch on February 6 and February 7. At the February 6 breakfast and at the February 7 lunch, there was some discussion regarding the proposed emergency regulation. At the February 8 breakfast, Robert Alverson, then chairman of the AP and manager of intervenor-defendant Fishing Vessel Owners Association, presented the views of the longline fishermen in favor of the proposal. The Council did not keep minutes, tape recordings, or other records of these mealtime discussions.

11. In addition to recommending the passage of an emergency regulation, the Council requested the Gulf of Alaska Groundfish Plan Team ("the Team") to prepare a range of alternatives for allocating the sablefish OY among gear types. These alternatives were to be in the form of a final amendment to the Gulf of Alaska Groundfish Fishery Management Plan. The Team was also to prepare a draft Regulatory Impact Review/Initial Regulatory Flexibility Analysis ("RIR") and a draft Environmental Assessment ("EA") for each of the proposed alternatives. These alternatives were to be presented to the Council at the March, 1985, meeting.

12. At the Council meeting of March 27–28, 1985, in Anchorage, Alaska, the Team presented seven alternative proposals concerning gear allocation in the Gulf of Alaska. These alternatives included: (1) maintain the status quo, (2) prohibit all gear but hook and longline for sablefish east of 140 degrees W longitude, (3) prohibit all gear but hook and longline for sablefish east of 147 degrees W longitude, (4) prohibit all gear but hook and longline for sablefish east of 159 degrees W longitude, (5) prohibit all gear but hook and long line for sablefish east of 170 degrees W longitude, (6) allocate the sablefish OY to specific gear types, and (7) establish a license limitation. During the meeting, the Council included an eighth alternative of limiting the number of vessels permitted to harvest sablefish using pot gear.

13. The Team also presented its draft RIR and draft EA. The draft RIR identified a specific gear conflict problem that existed between longliners and pot fishermen. Record, Vol. III.A.3 at p. 2–3.

14. In the course of the March meeting, the Council met for lunch on both March 27 and March 28. Neither of these lunches were open to the public. At one or both of these lunches, the Council members discussed matters pertaining to the sablefish portions of the Team's proposed amendments. The Council kept no minutes, tape recordings, or other records of these lunchtime discussions.

15. After the March meeting, the Team revised its proposed alternatives and the draft RIR and draft EA. These revisions were submitted to the public for review and comment. The Council received numerous comments from individuals with varying viewpoints. In light of these comments, the proposed alternatives, now known as Amendment 14, were revised again in time for Council consideration at its May, 1985, meeting.

16. The Council conducted an open meeting on May 21–24, 1985, in Anchorage,

Alaska. At this meeting the Council staff presented the revised proposals concerning sablefish allocation in the Gulf of Alaska and the revised draft RIR and draft EA. Approximately 35 people testified regarding the specific allocation proposals.

17. The Council also officially considered the recommendations of the SSC and the AP as to the Amendment 14 allocation alternatives. In its report the AP recommended that the Eastern Gulf of Alaska be reserved for longliners only. In 1986 the Central and Western Gulf sablefish OY would be allocated along the following lines: 50% of the OY to longliners, 25% to trawlers, and 25% to pot fishermen. Pot fishing would be phased out in the Central Gulf in one year and in the Western Gulf in three years. The phased-out pot fishermen allocation would revert to longline fishermen.

18. During the course of the May meeting the Council had several group lunches to which the public was not invited. These lunches occurred on May 22, 23 and 24. No minutes, tape recordings, or transcripts were taken of these lunch gatherings. There is no certainty as to what was discussed at those lunches.

19. By the end of the May meeting the Council had adopted the draft RIR, EA, and AP recommendation as to the Amendment 14 sablefish allocation provisions with but a few modifications. The final version of Amendment 14 prohibits trawl fishing directed at sablefish in the Eastern Gulf although permitting five percent of the OY in the Eastern Gulf to be caught by trawlers as incidental bycatch. The amendment limits the trawl sablefish fisheries in the Central and Western Gulf to 20% of the OY for those areas.

20. Under Amendment 14, pot fishing is scheduled to be phased out in the Gulf of Alaska over a three year period of time. Effective January 1, 1986, all pot fishing was prohibited in the Eastern Gulf. On January 1, 1987, pot fishing will be banned in the Central Gulf. By January 1, 1989, pot fishing for sablefish will be prohibited in the entire Gulf of Alaska.

21. Of the remainder of the sablefish OY in the Gulf of Alaska, 95% in the Eastern area and 80% in both the Central and Western areas, is allocated to the longline fishermen.

22. After adopting this recommendation, the Council requested its staff to prepare a final draft of Amendment 14 and its implementing regulations. On May 24, 1985, the Council approved the final draft and submitted it to NOAA for the final rulemaking procedure.

23. On July 26, 1985, NOAA published in the Federal Register a Notice of Proposed Rulemaking to implement Amendment 14. 50 Fed.Reg. 30481. In response to this notice, NOAA received 73 written comments dealing with the sablefish allocation. On September 26, 1985, NOAA approved Amendment 14 as submitted by the Council. The Notice of Final Rule implementing Amendment 14 was published on October 24, 1985, at 50 Fed.Reg. 43193. The amendment went into effect on November 18, 1985.

24. Plaintiffs filed this action in November, 1985, asking that Amendment 14 be declared unlawful to the extent that its provisions purport to prohibit or restrict the harvest of sablefish by pot fishermen or trawlers in the Gulf of Alaska. In addition, plaintiffs ask that the actions of the Secretary of Commerce in approving and implementing these sections of Amendment 14 be declared unlawful and void and that the Secretary be enjoined from enforcing the regulations implementing Amendment 14's sablefish provisions, 50 C.F.R. Section 672.24(b)(1) and Section 672.24(b)(2).

25. The scope and standard of judicial review in this case are determined by the FCMA, 16 U.S.C. Section 1851 *et seq.* This statute provides for judicial review of regulations promulgated by the Secretary under the authority granted by the FCMA. Section 1855(d). A regulation may be declared invalid only if the Secretary acted in an arbitrary and capricious manner in promulgating it. Section 1855(d); 5 U.S.C. Section 706(2)(A). A review of agency actions other than the adoption of specific regulations may be mandated, however, by the entire legislative scheme established by the FCMA. *Abbot [Abbott] Laboratories*

*v. Gardner,* 387 U.S. 136, 141 [87 S.Ct. 1507, 1510, 18 L.Ed.2d 687 (1967).

26. Under the legislative scheme of the FCMA, approval by the Secretary of a fishery management plan or amendment does not adversely affect anyone nor can it be considered final agency action for which there is no other adequate remedy in court. *Washington Trollers Association v. Kreps,* 466 F.Supp. 309, 312 (W.D.Wash. 1979), *remanded on other grounds,* 645 F.2d 684 (9th Cir.1981). In consequence, the Secretary's approval of a plan or amendment, standing alone, is not reviewable by the courts. *Id.*

27. The FCMA does permit judicial review of the Secretary's determination that a plan or amendment does not violate the FCMA's National Standards or other applicable law. 16 U.S.C. Section 1854(a), (b) and Section 1855; *Washington Trollers, supra,* 466 F.Supp. at 312. This determination, however, is not to be disturbed unless the conclusion was arbitrary and capricious or was an abuse of discretion. *Id.*

28. As for alleged procedural irregularities at the Council level, judicial review is appropriate only if the Secretary's decision to promulgate regulations is materially affected by the irregularities. "Deviation from the guidelines [for Council action] is not actionable absent affirmative proof that the deviation makes the Secretary's approval [of the amendment] arbitrary and capricious." *Louisiana v. Baldrige,* 538 F.Supp. 625, 630, n. 1 (E.D.La. 1982). If the Secretary has followed the appropriate rulemaking procedures and has established a rational basis for his action in promulgating regulations based on the submitted amendment, procedural challenges for irregularities at the Council level will not provide a justification for invalidating the regulations.

29. Plaintiffs have alleged that the Secretary's decision that Amendment 14 does not violate National Standard 4 of the FCMA was arbitrary and capricious. National Standard 4 provides:

> Conservation and management measures shall not discriminate between residents of different States. If it becomes neces-

sary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such a manner that no particular individual, corporation, or other entity acquires an excessive share of the privileges.

16 U.S.C. Section 1851(a)(4). Plaintiffs claim that Amendment 14 violates this standard because it discriminates in favor of longline fishermen, who are predominately Alaskan, at the expense of trawlers and pot fishermen, who are predominately non-Alaskan.

30. This Court must review the Secretary's determination that Amendment 14 does not violate National Standard 4 under an abuse of discretion standard. The administrative record constantly refers to the ground preemption and gear conflict problems which result from pot fishing and trawl fishing in the same area as longline fishing. In addition, the record indicates that all longliners will benefit from this regulation, not just the Alaskan longliners. In light of this information the Secretary could reasonably conclude that even though there may be some discriminatory impact from Amendment 14, the regulations satisfy the requirements of National Standard 4 in that they are tailored to solve the gear conflict problem and to promote the conservation of sablefish.

31. Plaintiffs contend that the Secretary's decision that Amendment 14 does not violate National Standard 5 was arbitrary and capricious. National Standard 5 provides:

> Conservation and management measures shall, where practicable, promote efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

16 U.S.C. Section 1851(a)(5). Plaintiffs claim that Amendment 14 violates this National Standard in that the Council adopted the measure for purely economic objectives without demonstrating the need for gear

allocation in light of social and biological objectives.

32. This Court reviews the Secretary's determination relative to National Standard 5 under an abuse of discretion standard. The final RIR and comments submitted to the Council and to the Secretary indicate that the Secretary considered several noneconomic objectives in promulgating the regulations. In consequence, the Secretary could reasonably conclude that Amendment 14 does not violate National Standard 5.

33. Plaintiffs contend that the Secretary's decision that Amendment 14 does not violate National Standard 7 was arbitrary and capricious. National Standard 7 provides:

> Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

16 U.S.C. Section 1851(a)(7). Plaintiffs claim that the Amendment 14, in not adopting the least restrictive alternative available for managing the sablefish resource, violates this National Standard.

34. This Court reviews the Secretary's decision relative to National Standard 7 under an abuse of discretion standard. In making a decision on the practicability of a fishery management amendment, the Secretary does not have to conduct a formal cost/benefit analysis of the measure. *See,* 50 C.F.R. Section 602.17(d). In making a determination that Amendment 14 was beneficial to the nation as a whole, the Gulf of Alaska Team conducted a study using Sitka, Alaska, as a prototypical community and fishery that would be affected by Amendment 14. This study provided a basis for concluding that pot and trawl fishing should be curtailed in the Gulf of Alaska for both sociological and environmental reasons. The study also provided a basis for concluding that the amendment was beneficial to the nation as a whole despite the fact that certain interest groups might be harmed. In consequence, the Secretary could reasonably conclude that Amendment 14 does not violate National Standard 7.

35. Plaintiffs have also claimed that the Secretary violated the National Environmental Policy Act ("NEPA") by not filing an Environmental Impact Statement (" 'EIS") as to the effects of Amendment 14 on the human environment. An agency must prepare an EIS when substantial questions are raised as to whether a project may cause significant degradation of the environment. *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 986 (9th Cir.1985). The agency's decision not to prepare an EIS should be upheld if reasonable. *Foundation for North American Wild Sheep v. Department of Agriculture,* 681 F.2d 1172, 1177 (9th Cir.1982). A court should not substitute its judgment for that of an agency if the agency's decision was fully-informed and well-considered. *Friends of Endangered Species, supra,* 760 F.2d at 986.

36. In support of their position that the EA for Amendment 14 did not adequately consider various environmental factors before concluding that an EIS was not necessary, plaintiffs cite *Weekly v. Baldrige,* No. A–83–283 (D. Alaska June 14, 1983). In *Weekly,* the National Maritime Fisheries Service prepared an EA for a regulation which closed a halibut fishery to all fishermen. This EA discussed the effects of the regulation on the halibut fishery only. The EA concluded that an EIS was not needed. The court in *Weekly* found this conclusion to be unreasonable in that the EA did not consider the impact on other fisheries that the closure of the halibut fishery might have.

37. Unlike *Weekly,* Amendment 14 does not close a highly worked fishery to all fishermen. Rather, the amendment allocates the already-established OY of sablefish among the existing gear fleets. The EA concludes:

> U.S. fishermen are expected to take an amount of sablefish equal to the optimum yields regardless of the type of gear used. No changes, therefore, in the predator-prey relationships or in the status of marine mammals and birds will occur under any of the discussed alternatives with the exception that a hook and

longline only restriction would remove from use trawl gear, a gear that is most productive on the continental shelf where larger concentrations of small sablefish are found.

Record, Vol. III.D.4 at p. 34. The decision not to file an EIS is reasonable based on this assessment of the impact of Amendment 14.

██ 38. Plaintiffs have claimed that several procedural irregularities that occurred at the Council level contribute to render the Secretary's decision to promulgate regulations based on Amendment 14 arbitrary and capricious. This Court finds, however, that the closed mealtime gatherings, the notice for the May, 1985, meeting of the Council, and the contact of the Governor of Alaska with the chairman of the Council did not affect the Secretary's decision in any way. These actions did not result in any improper material being added to the administrative record. The rulemaking procedure for public comment provided an opportunity for every interested person or group to present arguments to the Secretary. As this Court has already found that the Secretary's decisions as to the National Standards were supported by the record, the alleged procedural irregularities at the Council level do not cause the decisions of the Secretary to be arbitrary and capricious.

██ 39. Plaintiffs further contend that Amendment 14 establishes a limited access system. They also claim that the Secretary failed to consider certain aspects of this limited access measure as required by 16 U.S.C. Section 1853(b)(6). As a result of this alleged failure, plaintiffs conclude that the adopted regulations should be declared invalid.

40. This Court finds that Amendment 14 does not establish a limited access system, as defined at 50 C.F.R. Section 602.-15(c)(1) in that the measure does not seek to limit the "units of effort" in the Gulf of Alaska sablefish fishery. The regulations at issue regulate the allocation of the OY among fishermen using different gear

types. This management technique is described by the FCMA as a measure different from a limited access measure. See, 16 U.S.C. Section 1853(b)(4). Moreover, even if Amendment 14 were a limited access measure, the record as a whole indicates that the Secretary considered the factors set forth in 16 U.S.C. Section 1853(b)(6).

██ 41. Plaintiffs argue that the Council did not provide a reasoned basis for its actions and that the measure is not rationally connected to any gear conflict problem in the Gulf of Alaska. The record clearly reveals, however, that the Council was concerned about the potential conflict between pot gear and longline gear. The RIR reflects a full consideration of the potential conflict and of possible grounds preemption. The measure to phase-out pot fishing in the Gulf is rationally related to solving this problem. Contrary to plaintiffs' assertion, the Secretary does not have to choose the least restrictive alternative to remedy the perceived problem. In consequence, the Secretary's decision to promulgate regulations based on Amendment 14 cannot be considered arbitrary and capricious.

██ 42. Plaintiffs contend that the Secretary acted in an arbitrary and capricious manner in adopting Amendment 14 without a full consideration of its effect on the trawl fishing industry and on the ability of U.S. fishermen to harvest the OY of all groundfish in the Gulf of Alaska. The percentage of the OY to be allocated to trawl fishermen, however, was based on the recommendation of the AP. The AP is made up of representatives of various fishing groups, including trawl fishermen. It was reasonable for the Council to base its final proposal on this recommendation. In consequence, the Secretary's decision to promulgate regulations based on the allocations of sablefish OY suggested by Amendment 14 was not arbitrary and capricious.

██ 43. Plaintiffs claim that the Secretary's decision was arbitrary and capricious because he considered information that was not before the Council or part of

the administrative record in evaluating the amendment's compliance with the National Standards. This information includes a fishery "best blend" study and other studies.

44. Plaintiffs' argument does not compel enjoining the enforcement of the regulations in question. In evaluating a fishery management plan, the Secretary may use a variety of information sources. As long as the plan satisfies the National Standards and does not violate any other applicable law, the information used to evaluate the plan cannot render the Secretary's approval of the plan arbitrary and capricious. In contrast to *Washington Trollers Association v. Kreps*, 645 F.2d 684 (9th Cir.1981), the studies cited by the Secretary in the present case were not used to establish the OY limits or the gear allocation. Rather, the studies served as information by which to judge the validity of the plan. In consequence, plaintiffs' challenges to the regulations on the grounds that the Secretary improperly referred to a "best blend" study and other studies must fail.

45. Plaintiffs' final challenge involves the participation of the Alaska Regional Director of the National Marine Fisheries Service ("NMFS") both on the Council and in the Secretarial review process. Plaintiffs contend that this dual role creates an improper conflict of interest.

46. A decision-maker in an informal rulemaking should be disqualified only when there has been a clear and convincing showing that the agency member has an unalterably closed mind on matters critical to the disposition of the proceeding. *Association of National Advertisers v. Federal Trade Commission*, 627 F.2d 1151, 1170 (D.C.Cir.1979). Unlike an adjudicative proceeding, participation by a single individual at two different levels of the rulemaking process does not create a conflict of interest. The evidence on the record in the present case cannot support an inference that the Regional Director's mind was unalterably closed on the issue of

the validity of Amendment 14. In consequence, plaintiffs' challenge in this regard must be denied.

Accordingly, the motion of plaintiffs for partial summary judgment is DENIED. The motion of defendant for summary judgment is GRANTED as to the issues addressed in that motion. The motion of intervenor-defendants for summary judgment is GRANTED as to the issues addressed in that motion.

The Clerk of this Court is instructed to send uncertified copies of this order to all counsel of record.

Dated this 28 day of August, 1986.