**SEA WATCH INTERNATIONAL, et al., Plaintiffs,**

**v.**

**Robert A. MOSBACHER, Defendant.**

**James PEARSON, et al., Plaintiffs,**

**v.**

**Robert A. MOSBACHER, et al., Defendants.**

**Civ. A. Nos. 90–1616(MB), 90–1626(MB).**

United States District Court,
District of Columbia.

April 9, 1991.

Jonathan S. Kahan, Hogan & Hartson, Washington, D.C., for plaintiffs.

Diane M. Connolly, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION

BOUDIN, District Judge.

Plaintiffs filed these actions on July 13, 1990, seeking judicial review of administrative actions taken by defendant Bryson in his capacity as Executive Director of the Mid–Atlantic Regional Fishery Management Council and approved by defendant Mosbacher, the Secretary of Commerce ("the Secretary"), under the Magnuson Fishery Conservation and Management Act of 1976, 16 U.S.C. §§ 1802–1882 ("the Magnuson Act" or "the Act"). The cases were consolidated on October 17, 1990, and the parties filed cross-motions for summary judgment. In addition, defendants have moved to dismiss both cases on timeliness grounds. Oral argument was heard on March 11, 1991. For the reasons stated below, the Court denies defendants' motion to dismiss, but grants summary judgment for the defendants.

## I. THE FACTS

In 1976, Congress passed the Magnuson Act, which created eight Regional Fishery Management Councils and gave them authority to regulate fishery resources found in federal waters off the coasts of the United States. 16 U.S.C. §§ 1852(a)(1)–(8). The Councils develop, administer, and revise fishery management plans ("FMPs") that regulate fishing for the species in the Councils' respective geographical areas. 16 U.S.C. § 1852(h)(1). When adopting FMPs or FMP amendments, the Councils must follow certain procedures set forth by the Act, 16 U.S.C. § 1852(j), and also must comply with express provisions governing the content of FMPs, 16 U.S.C. § 1853. Additionally, they must ensure that the FMPs are consistent with seven National Standards ("the Standards") enumerated by the Act. 16 U.S.C. § 1851. Once a Council adopts an FMP or amendment, it is submitted along with proposed implementing regulations to the Secretary of Commerce for review. 16 U.S.C. § 1853(c). The Secretary reviews the FMP or amendment for consistency with the Standards, the Act, and other applicable law. 16 U.S.C. § 1854. If the Secretary approves the FMP or amendment, the Secretary then promulgates the regulations. 16 U.S.C. § 1855(c).

In 1977, the Mid–Atlantic Regional Fishery Management Council ("the Council") began to regulate the surf clam and ocean quahog fisheries. The original FMP for these fisheries has been amended several times. In 1979, the surf clam fishery was divided into the Mid–Atlantic and New England surf clam fisheries. The Mid–Atlantic Council retained primary authority over both fisheries, as well as over the ocean quahog fishery. In each of the three fisheries, the Council established an aggregate annual catch quota, attainment of which would result in closure of that fishery for the year.

The Council regulated the three fisheries under different plans. Access to the Mid–

Atlantic surf clam fishery was limited by a moratorium on the entry of new vessels, coupled with a system of permits restricted to 184 vessels with a history of surf clam fishing in the region. The permits were tied to the individual vessels for which they were issued, and could only be transferred together with those vessels. The vessels could not be replaced unless they sank, were destroyed by fire or otherwise left the fishery involuntarily. Thus, only vessels originally awarded permits could fish in the Mid–Atlantic surf clam fishery, a scheme which remained unchanged from 1977 to 1990. Additionally, access to the fishery was controlled by "effort restrictions" limiting the number of hours each vessel could fish. There were, however, no limitations on the quantity of surf clams that could be harvested on a fishing trip.

The New England surf clam fishery was less restricted, with no permit system, and effort restrictions imposed only if a certain percentage of the annual aggregate catch quota was harvested. This fishery was further divided into two sub-areas, and separate quotas and quarterly sub-quotas were established for each. Finally, the quahog fishery essentially went unrestricted, except for the annual aggregate quota. Access to the fishery was unlimited, and effort restrictions were imposed only briefly in 1984. While the FMP authorized quarterly quotas, these quotas were never established. The annual aggregate quotas were set at levels above those actually reached, and the fishery thus was never closed.

In 1988, the Council proposed Amendment 8 to the Fishery Management Plan for Surf Clams and Ocean Quahogs ("Amendment 8"). This Amendment was the culmination of several years of work by the Council, and reflected numerous concerns about the viability of existing regulations, the migration of vessels from the surf clam fishery to the less-regulated quahog fishery, and the resultant increase in the quahog harvest. Amendment 8 was approved by the Secretary and implemented by regulations published in the Federal Register on June 14, 1990. The regulations became effective on September 30, 1990. Amendment 8 brought the three fisheries under a single limited access scheme built around individual transferable quotas ("ITQs"), which are transferable permits to fish for a fixed percentage of the annual aggregate catch quota for the species and area. Thus, although the annual quota for all fishermen may vary from year to year depending on the Council's determination of an optimum yield, the holder of, e.g., a 5% ITQ would be entitled to catch up to 5% of that quota.

For each of the fisheries, ITQs were allocated on the basis of vessel fishing history, although the data used to calculate that history and the weight assigned to it varied between the fisheries. For example, in the Mid–Atlantic surf clam fishery, eighty percent of the ITQ was derived by averaging vessel catch history from 1979 to 1988, with the last four years counted twice, and the lowest two years deleted. The other twenty percent was based upon the vessel's dimensions, as a proxy for the owner's capital investment. The results were divided by the total for all vessels in the fleet, producing an ITQ expressed as a percentage of the annual quota.[1]

After Amendment 8 went into effect, two groups of fishermen and seafood processing companies brought these actions, alleging serious economic harm from the ITQ assignments. Their most salient arguments are, first, that the ITQ system exceeded the defendants' statutory authority and, second, that the decision to limit access to the quahog fishery was unsupported by the administrative record. In each case, there are additional arguments that the challenged action also violated the National Standards for the other applicable provisions of the Magnuson Act.

1. In the New England surf clam and the ocean quahog fisheries, the ITQ was the average of a vessel's catch history for every year between 1979 and 1988 that the vessel actually participated in the fishery, excluding the lowest year for vessels that participated for more than one year. These calculations were then divided by the total for all vessels to obtain a percentage figure.

## II. DISCUSSION

### A. TIMELINESS

■ The first issue to be resolved is the defendants' motion to dismiss on the ground that these suits were untimely. The Court concludes that the complaints were filed within the limitations period provided by the Magnuson Act.

The Magnuson Act states that regulations promulgated by the Secretary under the Act are subject to judicial review "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated." 16 U.S.C. § 1855(d). The present dispute turns on the meaning of the word "promulgated" for purposes of determining whether the plaintiffs' petitions are time-barred by this section of the Act. Defendants assert that the regulations were promulgated on June 8, 1990, the date they were filed with the Office of the Federal Register. Plaintiffs claim promulgation occurred on June 14, 1990, when the regulations were actually published in the Federal Register. It is undisputed that the petitions for review were filed on July 13, 1990, thirty-five days after the regulations were filed, but twenty-nine days after their publication.

Courts construing this section "have almost universally agreed that the thirty day limit commences at the time the regulations are published." *Kramer v. Mosbacher*, 878 F.2d 134, 137 (4th Cir.1989); *Midwater Trawlers Coop. v. Mosbacher*, 727 F.Supp. 12, 15 (D.D.C.1989). It is true that none of these courts squarely addressed the fine distinction between publication and filing urged by defendants in this case. Rather, they have held that various attempts to equate "promulgation" with much later dates, such as implementation

or amendment of the regulations, were barred by the statute.[2] Nevertheless, it appears to be the case that wherever a court has calculated the limitations period under the Act, it has used the publication date as its starting point.[3] This usage is in accord with the accepted meaning of "promulgate" as "[t]o publish; to announce officially; to make public as important or obligatory."[4]

Even if this common usage had not previously been adopted by courts considering the issue under the Magnuson Act, sound policy reasons would dictate choosing the publication date, not the filing date, as the relevant date for calculating the limitations period under Section 1855(d). Publication in the Federal Register is the occurrence by which the world at large is given notice of the Secretary's decision. Such a visible formal event is highly desirable in the context of limitation of actions, in order to have a single recognizable date from which to calculate the running of the statute of limitations. The filing of the regulations at the Office of the Federal Register is a formal event, but one far less visible and far less easily monitored by parties potentially affected by the regulations.

Defendants cite language in the Federal Register Act to the effect that "publication" and "promulgation" are separate events, and claim the latter should be equated with the date of filing. *See* 44 U.S.C. § 1507. That same statute, however, also juxtaposes "promulgation" and the "filing of a document" with the Office of the Federal Register, weakening this semantic argument. On the whole, the Federal Register Act appears simply to use the word "promulgated" as a synonym for official adoption, a meaning that defen-

---

**2.** *E.g., Kramer*, 878 F.2d at 137 (challenge to implementation of regulations barred where publication occurred more than thirty days prior); *National Food Processors Ass'n v. Klutznick*, 507 F.Supp. 76, 78 (D.D.C.1981) (where regulations were published more than thirty days prior to suit, plaintiffs' challenge was limited to that portion of the regulations affected by more recent amendment).

**3.** The sole exception cited to the Court is *Islamorada Charter Boat Ass'n v. Verity*, 676 F.Supp.

244, 246 (S.D.Fla.1988), where the court used the (*post*-publication) date on which the regulations were implemented by the Secretary.

**4.** Black's Law Dictionary 1214 (6th ed.1990). *See also National Grain & Feed Ass'n v. OSHA*, 845 F.2d 345, 346 (D.C.Cir.1988) (absent agency definition of "promulgation," plain language of applicable statute and ordinary usage of the term controlled).

dants themselves do not ascribe to the same term when used in the Magnuson Act as the trigger date for judicial review. In this latter context, it makes most sense to read "promulgation" as the date of publication in the Federal Register, regardless of when particular parties may be claimed to have received actual or constructive notice.[5] Accordingly, the Court holds that these regulations were promulgated on the date they were published in the Federal Register, and plaintiffs' petitions thus were filed within the time provided by Section 1855(d).[6]

## B. THE MERITS

In their cross-motions for summary judgment, the parties have made numerous arguments in briefs and replies totalling more than 200 pages. In the discussion that follows, the Court has addressed only those arguments that appear most significant to the parties' claims. The other arguments not specifically addressed in this opinion have been reviewed and considered, but deemed not to affect the ultimate result.

### 1. *The ITQ System*

 *"Property Rights" Claim.* Plaintiffs argue that implementation of the ITQ system for the three fisheries exceeds the Council's and the Secretary's statutory authority, and should therefore be set aside under Section 706(2)(C) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C), as incorporated into the Magnuson Act by 16 U.S.C. § 1855(d). Where Congress has spoken with precision on an issue, its determination resolves the matter; where the issue is less clearly determined by the stat-

ute, an agency interpretation ordinarily is upheld if it represents a reasonable construction of the statute. *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). The gist of plaintiffs' claim on this point is that an ITQ system "amount[s] to privatization of the surf clam and quahog resource," and that such a "transfer of private ownership interests in a fishery" is both unauthorized by the Magnuson Act and in conflict with an express prohibition on the assessment of fees in excess of costs.[7] *See* 16 U.S.C. § 1854(d).

The difficulty with plaintiffs' argument is that Congress did authorize the creation of quotas. The Act expressly authorizes the Council and the Secretary to impose permit requirements and to establish limited access systems. 16 U.S.C. §§ 1853(b)(1), (6). The legislative history of this section refers specifically to the possibility of dividing "the total allowable catch into shares or quotas which are then distributed among the fishermen." S.Rep. No. 416, 94th Cong., 1st Sess. (1975), *reprinted in Legislative History of the Fishery Conservation and Management Act of 1976,* at 691–92 (1976). Even without this legislative history, the language of the section broadly embraces the possibility of quotas. Nothing in its terms, and nothing else in the Magnuson Act cited to this Court, precludes making quotas transferable. Indeed, transferable permits were precisely the method utilized in the Mid–Atlantic surf clam fishery prior to adoption of Amendment 8, although transfer was linked to sale of the vessel.[8] The present

---

**5.** For this reason, the Court also rejects the defendants' alternative argument that under the Federal Register Act, filing with the Office of the Federal Register provides constructive notice to persons subject to or affected by the document. The question in this case is not "notice" to any specific party; it is determining a single recognizable event from which the time for initiating judicial review may be calculated.

**6.** Defendants also cite *American Petroleum Institute v. Costle,* 609 F.2d 20 (D.C.Cir.1979), which defined the term "promulgation" under the Clean Air Act as the date a rule is filed. However, the court in *American Petroleum* was not

dealing with the limitations provision of the Clean Air Act, but with the different question of the last possible date on which the agency could add information to the administrative docket. *Id.* at 22–24.

**7.** Memorandum of Plaintiffs Pearson, *et al.* in Support of Motion for Partial Summary Judgment [hereinafter *Pearson* mem.] at 12, 27.

**8.** Defendants assert that under the previous system, sale of a vessel in the Mid–Atlantic surf clam fishery commanded a premium of anywhere from $50,000 to $150,000 over and above the value of the vessel itself. While plaintiffs'

ITQ system differs only in degree from the system of aggregate quotas and transferable permits previously in use and unchallenged by plaintiffs, and the interests created by it fall short of actual full-scale ownership.

The quota under the prior system indeed was derived somewhat differently, being expressed in terms of a given number of hours fishing rather than a percentage of the aggregate catch. However, plaintiffs fail to explain why this difference is significant.[9] The new quotas do not become permanent possessions of those who hold them, any more than landing rights at slot-constrained airports become the property of airlines, or radio frequencies become the property of broadcasters. These interests remain subject to the control of the federal government which, in the exercise of its regulatory authority, can alter and revise such schemes, just as the Council and the Secretary have done in this instance.[10] An arrangement of this kind is not such a drastic departure from ordinary regulation, nor is it so akin to the sale of government property, that the Court must require a more precise expression of congressional intent to uphold it.

■ There is even less to be said about plaintiffs' claim that the ITQ plan violates the prohibition on assessment of fees in excess of costs found in 16 U.S.C. § 1854(d).[11] Plaintiffs complain that, because the ITQs are transferable, one fishermen must pay another for an ITQ. The statutory limitation on fees in excess of costs seemingly is designed to prevent the government from using quotas as a revenue-raising measure. That purpose is in no way frustrated by ITQ payments between fishermen. Certainly the payments are a barrier to a fisherman who wants to fish but does not possess an ITQ, but an even greater barrier would be provided by quotas that were not transferable at any price. Neither regime involves the agency in raising revenues in excess of costs.

*National Standard 4.* Plaintiffs contend that the ITQ system is contrary to National Standard 4, which reads in its entirety:

> (4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1851(a)(4). Plaintiffs claim the system contravenes subsection (A) of this Standard by treating similarly situated

---

statement of material facts in dispute questions the Council's estimates of the value of that premium, it does not dispute its existence. It is thus unsurprising that the surf clam and quahog ITQs also sell at a premium.

9. Although plaintiffs argue that the ITQ system grants those fishermen who hold ITQs the right to "leave their share of fish in the sea" and exclude other fishermen from it, it is hard to see why this should alter the outcome. For the most part, the ITQ owners have ample incentive to use their rights to the fullest extent. If the Council and the Secretary determine that the quotas are not being used, nothing prevents them from altering the present regime to allow distribution and use of any unused quotas.

10. Plaintiffs have selected excerpts from statements made during the administrative proceedings in which defendants themselves have applied the term "property right" or similar labels to the ITQs. *See* Plaintiffs' Opposition to Defendants' Cross–Motion for Summary Judgment at 9–10. When examined in full, most of these quotations indicate that the property analogy was employed with an appropriate qualification. *E.g.*, AR 1759 ("Amendment 8 implies that [ITQs] are property in that they are 'owned' and can be sold, similar to a share of stock, *at least so long as the management scheme creating the rights is in place*") (emphasis added). Further, the Council's mere expressions of hope that the Amendment 8 regime would provide a lasting solution do not in themselves exclude the possibility of later re-evaluation and revision of the regulations.

11. Section 1854(d) reads in pertinent part: "The Secretary shall by regulation establish the level of any fees which are authorized to be charged pursuant to section 1853(b)(1) of this title. . . . The level of fees charged under this subsection shall not exceed the administrative costs incurred in issuing the permits."

fishermen unequally; by rewarding violators of prior regulations; and by discriminating against owners of smaller fishing fleets. These results are said to be arbitrary and capricious or an abuse of discretion under 16 U.S.C. § 1855(d) and 5 U.S.C. § 706(2)(A).

■ The argument that the ITQ system treats similarly situated fishermen unequally begins with the fact that ITQ assignments were calculated from vessel catch histories rather than individual catch histories. Thus, plaintiffs assert, the assignments ignored the high rate of vessel turnover in the industry, excluding individuals with a substantial catch history who recently sold a vessel, and awarding a "windfall" to individuals with little or no history who recently purchased a vessel. They claim this result is inherently unfair and inequitable under subsection (A) of Standard 4.

However, National Standard 4 does not require that allocations of quotas to fishermen be made by calculating the exact historical catch of each fisherman on an individual basis. In fact, previous regulation of the Mid–Atlantic surf clam fishery also was based on vessel data, insofar as moratorium permits were awarded to vessels with a history of participation in the surf clam fishery, and were transferable only along with those vessels. The record supports defendants' claim that vessel catch data, used as a surrogate for individual catch history, was the only accurate data available. AR 225, 227, 958. The high rate of vessel turnover only serves to underscore the difficulty of obtaining data organized by individual owner. The decision not to do so reflects not mere administrative convenience, but a consistent and reasonable regulatory scheme.

Plaintiffs argue the ITQ system violates National Standard 4 because it rewards

fishermen who violated previous regulations in the Mid–Atlantic surf clam fishery by fishing longer than allowed. Since allocations were based on past catch history, and a cheater's history necessarily would reflect larger catches, plaintiffs claim that the new system is unfair and inequitable to those fishermen who complied with the effort restrictions. The defendants assert that since a majority of the participants in the fishery cheated to some degree, it is impossible to determine which vessels were involved in the violations. They note that any unfairness is offset by the fact that twenty percent of the Mid–Atlantic surf clam ITQs were based on vessel size, not catch history.

The record demonstrates that the Council and the Secretary considered this problem, and addressed it in the preamble to the final regulations. AR 1779. The Act itself aims at taking some account of catch histories when allocating limited access rights. 16 U.S.C. § 1853(b)(6)(B). It is not clear how adjustments could be made to eliminate the effect of previous violations, many of which, it is fair to suppose, were never detected, and others of which have already been punished.[12] Plaintiffs have failed to demonstrate that this use of past histories is irrational, or that it violates the Magnuson Act.

■ Plaintiffs next contend that the ITQ system violates National Standard 4 because it is intended to drive a particular group of individuals, the single vessel and small fleet owners, out of the fisheries. Since Amendment 8 permits owners to catch their entire ITQ with a few vessels, the argument runs, it will result in lower average costs to the owners of large fleets, and provide them with an unfair competitive advantage. Moreover, it is alleged, small fishermen lack the capital to pur-

---

**12.** Plaintiffs themselves admit that "[d]efendants are correct when they claim that there is no way to correct this unfortunate result, since 'it is impossible to determine the degree to which any one vessel was involved in violations.'" *Pearson* mem. at 35. They thus acknowledge, no less than defendants, that there is no practical way to adjust for previous violations. However, while they conclude that this

practical impossibility "is exactly why it is inappropriate and illegal to implement an allocation scheme that inevitably rewards past violators at the expense of honest fishermen," *id.* at 35–36, the Secretary and the Council simply concluded that this defect could not be remedied within an otherwise valid scheme. Under the circumstances, the Court does not find this decision irrational.

chase sufficient ITQs to operate their vessels at full capacity, and ultimately will be driven out of business. It is quite possible that scale economies and transferability of ITQs will produce some consolidation. It is also possible that small fishermen enjoy advantages of their own, and nothing prevents coalitions of small owners from pooling their allocations to obtain efficiencies. Moreover, single vessel or small fleet owners may happen to have substantial allocations depending upon their history. Even where a fisherman with a small allocation decides to exit, transferability of the ITQ provides at least some compensation. There is nothing intentionally invidious or inherently unfair in the plan adopted by the Council and the Secretary. "Inherent in an allocation is the advantaging of one group to the detriment of another." 50 C.F.R. § 602.14(c)(3)(i).

### 2. Limitation of Access to the Quahog Fishery

Aside from the general challenges to the ITQ system described above, plaintiffs make several specific challenges to the decision to limit access to the ocean quahog fishery by bringing it under the same regulatory scheme as the two surf clam fisheries. They argue that the decision lacks support in the administrative record; that it does not comply with the Act's express requirements for a limited access management scheme; and that it violates applicable National Standards. The Court will address each claim in turn.

■■■ The Administrative Record. Plaintiffs contend that the decision to include ocean quahogs in the ITQ system lacks support in the administrative record and was arbitrary and capricious. Such claims are reviewed under a standard of deference. National Fisheries Inst. v. Mosbacher, 732 F.Supp. 210, 219 (D.D.C. 1990). While the Court indeed must ensure that the Secretary's decision was rational, it " 'is not empowered to substitute its judgment for that of the agency.' " Id. at

223 (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). Under this standard, the Court concludes that the Secretary's decision, though based on conflicting, even speculative, evidence about trends affecting the ocean quahog resource in the future, nonetheless had a rational basis, and was not arbitrary or capricious.

In brief, plaintiffs' argument is that any regulation of the resource is responding to a "problem that does not exist." [13] They dispute the Council's claim of an upward trend in the ocean quahog harvest data, and its prediction that the same "overcapitalization" that required restriction of access to the surf clam fisheries eventually will occur in this fishery. They cite the lower market demand for quahogs, and the undisputed fact that the annual quahog catch quota has never been reached. They correctly assert that the Council and the Secretary may not reason by analogy from the surf clam resource to the quahog resource, but must have an independent rational basis for the decision. Motor Vehicle Mfrs. Ass'n v. EPA, 768 F.2d 385 (D.C.Cir.1985), cert. denied, 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 892 (1986).

However, the administrative record shows that the Council's Scientific and Statistical Committee recommended the inclusion of quahogs in a comprehensive fishery management plan for several years prior to adoption of Amendment 8, AR 65, 197, 1805, and that the Council considered other alternatives, AR 496–97, 502–03. The ultimate decision to adopt this recommendation was based on several related grounds, including the fact that surf clams and quahogs had become substitute goods for certain uses, AR 65, 388; that existing surf clam restrictions had already resulted in movement of vessels from that fishery into the quahog fishery, AR 197, 1805; and that the potential for further migration to and increased catches in the quahog fishery would be heightened by placing the surf clam fishery under the ITQ system while

---

13. City of Chicago v. Federal Power Comm'n, 458 F.2d 731, 742 (D.C.Cir.1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972).

leaving the quahog fishery unregulated, AR 399, 1692. The Council coupled these long-term concerns with evidence of a recent increase in the quahog harvest. AR 1886.[14]

■ In sum, the threat to the ocean quahog resource is reflected in the need for the existing annual quotas. An increase in this threat is posed by the diversion of ships from the surf clam to the quahog fishery as surf clam restrictions tighten. Both regulators and fishermen have an interest in having ground rules established before any problem matures. Contrary to plaintiffs' arguments, the Act does not mandate any finding of necessity before fishery access can be limited. The accompanying regulations state that "[i]n an unutilized or underutilized fishery, [limited access] may be used to reduce the chance that [overfishing or overcapitalization] will adversely affect the fishery in the future." 50 C.F.R. § 602.15(c). The issue thus turns on predictions about the future in an area of technical and scientific expertise, where special deference is due to regulatory agencies. *Building & Constr. Trades Dep't v. Brock*, 838 F.2d 1258, 1266 (D.C.Cir.1988). Although plaintiffs' attack on this determination is by no means a frivolous one, the Court holds that the Council and the Secretary did have a rational basis for their action.

■ *16 U.S.C. § 1853(b)(6).* The Magnuson Act expressly provides that the Council and the Secretary may

establish a system for limiting access to the fishery in order to achieve optimum yield if, in developing such system, the Council and the Secretary take into account—(A) present participation in the fishery, (B) historical fishing practices in, and dependence on, the fishery, (C) the economics of the fishery, (D) the capability of fishing vessels used in the fishery to engage in other fisheries, (E) the cultural and social framework relevant to the fishery, and (F) any other relevant considerations.

16 U.S.C. § 1853(b)(6). Plaintiffs contend that the decision to limit access to the ocean quahog fishery violated subsections (A) and (B) of this provision by failing to take adequate account of both present and past participation in the fishery. With regard to the former point, they assert that the Secretary's failure to give extra weight to recent quahog catch data, to use catch data from 1989 or 1990, or to take account of vessel size, mean that the ITQ allocations were not adequately based on "present participation in the fishery." On the latter point, they reiterate their argument that "historical fishing practices" would have been better reflected by individual catch histories rather than vessel catch histories, and assert that their investment in new vessels should have been given weight as evidence of "dependence on the fishery." Moreover, they argue that there is no evidence that the limited access scheme is necessary "in order to achieve optimum yield."

Here again, the administrative record indicates that the Council considered precisely these objections en route to making its decision. AR 1779–80; 1850–53. The very language of Section 1853(b)(6) indicates that its enumerated factors must be balanced against each other and against "any other relevant considerations." As long as the Council and the Secretary took these factors into account, the Court may not second-guess the accuracy of the balance struck. The choice of cut-off dates and weighting formulas thus was not arbitrary and capricious or an abuse of discretion. Last, the Court has addressed the arguments about vessel catch histories and the

---

**14.** In interpreting a table of quahog landings between 1979 and 1987, defendants stress that the number of quahogs caught rose from 2.9 million bushels in 1981 to 4.7 million bushels in 1987, an increase of over 60%. Plaintiffs note that even the latter figure is more than a million bushels lower than the annual quota of 6 million bushels, which has never been caught. However, given that harvests were consistently in the 3 to 4 million bushel range while quotas ranged from 4 to 6 million, the Court cannot say that the Council's concern was unwarranted. For purposes of judicial review, the important point is that it was rational for the Council and the Secretary to consider the evidence of a possible trend.

asserted "necessity" requirement earlier in this opinion. *See supra* at 376–377, 379.

■ *The National Standards.* Plaintiffs argue that Amendment 8 creates incentives for consolidation of the quahog fishery, and has in fact resulted in consolidation, contrary to National Standard 4 and its prohibition of "excessive shares." [15] They allege that two fishermen now hold ITQs totalling forty percent of the annual catch quota for ocean quahogs, and that fragmentation of the remaining shares will necessarily result in further consolidation, as holders of smaller shares sell their interest. This figure does give pause, although the raw number may not be economically significant.[16] The defendants have acknowledged that increased efficiency due to consolidation was one of the explicit objectives of Amendment 8. However, the Act contains no definition of "excessive shares," and the Secretary's judgment of what is excessive in this context deserves weight, especially where the regulations can be changed without permission of the ITQ holders. The record reflects that the Council and the Secretary considered the problem, and addressed it by providing for an annual review of industry concentration, with the possibility of referral to the Department of Justice. AR 1779.

■ The Court also rejects the contention that the Council's and the Secretary's decision to limit access to the quahog fishery was in violation of National Standard 5, which states that "[c]onservation and management measures shall, where practicable, promote efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as

its sole purpose." 16 U.S.C. § 1851(a)(5). Plaintiffs urge that the inclusion of quahogs in the limited access scheme of Amendment 8 was motivated solely by economic reasoning. The Court finds, however, that the conservation concerns cited by the Council and the Secretary were integral to their inclusion of quahogs in the limited access scheme. The record demonstrates a clear concern that the exit of vessels from the surf clam fishery could place a strain on the quahog resource when those vessels then entered the quahog fishery, as they already had begun to do under the prior regulations. Where the Secretary considered and relied upon such noneconomic objectives when reviewing and promulgating regulations, there is no violation of National Standard 5. *See Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1465 (9th Cir.1987).[17]

■ Finally, the plaintiffs argue that the limited access scheme violates National Standard 7, which states that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7). However, it is settled law that "in making a decision on the practicability of a fishery management amendment, the Secretary does not have to conduct a formal cost/benefit analysis of the measure." *Alaska Factory Trawler Ass'n*, 831 F.2d at 1465; *see National Fisheries*, 732 F.Supp. at 222. Here, there is ample evidence in the record that the Council considered the costs and benefits of including quahogs in the ITQ system at several

---

**15.** 16 U.S.C. § 1851(a)(4)(C). Plaintiffs also argue that National Standard 4 requires a showing of necessity before allocations of fishing rights can be made, and claim that there is no such showing as to the ocean quahog fishery. The latter assertion has been addressed above, while the "necessity" argument again is countered by reference to the regulations accompanying the Act, which state that allocations may be made "if such measures are necessary *or helpful* in furthering legitimate objectives." 50 C.F.R. § 602.14(c) (emphasis added).

**16.** Even if the raw number measured a true economic market—which is by no means

clear—a judgment of undue concentration could not be based on the mere existence of such a share possessed by the two largest participants.

**17.** Defendants also cite the administrative and enforcement ease associated with promulgating the same management scheme for the two fisheries, and at the same time. This concern standing alone does not exempt the scheme from the requirements of National Standard 5. However, when taken together with record evidence that similar conservation problems might exist in the two fisheries, it provides additional support for the Secretary's decision.

points in the administrative process. *E.g.,* AR 405, 496, 502, 1152–72.

For all the reasons detailed above, the Court finds that the Secretary's decision to limit access to the ocean quahog fishery was not arbitrary and capricious or an abuse of discretion within the meaning of the Magnuson Act.

## C. SUPPLEMENTATION OF THE RECORD

Plaintiffs attached several affidavits of fishermen and a 1990 fishery report produced by the Council as exhibits to their motions for partial summary judgment. Defendants have moved to strike these materials on the ground that this Court's review is limited to the administrative record certified by the Council. *See Florida Power & Light v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985). Citing exceptions to this rule, plaintiffs argue, first, that the material in the affidavits was wrongfully excluded from the certified record; and second, that the report shows the eventual falsity of predictions on which the Secretary relied when promulgating the regulations.

This dispute does not affect the outcome in this case. As to the affidavits, the pleadings leave unclear the extent to which the information contained in them was before the Council, and thus properly part of the record under review. However, it appears that at least vessel catch histories and estimated ITQ allocations were considered by the Council. To that extent, consideration of the proffered affidavits is proper for the limited purpose of proving that Amendment 8 has had a general impact on fishermen, if this was ever in doubt. However, the principal thrust of these affidavits is to show the adverse impact of Amendment 8 on certain plaintiffs. Since the record shows that the Secretary considered the prospect that *some* fishermen—if not this particular group of fishermen—could be adversely affected, the affi-

davits fail to undercut the Court's central finding that the Council and the Secretary had a rational basis for adopting Amendment 8. Thus, even treating the affidavits as part of the record, the result remains unchanged.

 The Court also agrees that the 1990 Council report is properly considered under the rule of *Amoco Oil Co. v. EPA,* 501 F.2d 722, 729 n. 10 (D.C.Cir.1974), which held that information subsequent to an agency decision may be considered if it "bears directly upon the plausibility of certain predictions made ... in promulgating the [r]egulations." However, while the proffered evidence may be relevant to the Council's predictions, it is insufficient to alter the Court's decision. Plaintiffs cite the report as proof "that defendants erroneously predicted that the quahog resource was in danger of being overfished." Plaintiffs' Opposition to Motion to Strike at 9. This claim rests on an observation in the report that the "DeLury method" for estimating the size of the quahog resource shows that ocean quahog biomass "may possibly be about double" the estimate produced by another method. Plaintiffs' Exhibit B at 7. However, this alternative estimate derived by the DeLury method is on its face highly qualified, and it apparently did not affect the Council's decision, contained in the very same report, to keep the 1991 aggregate quahog catch quota in line with earlier quotas.[18] The 1990 fishery report thus does not affect the Court's decision.

## D. OTHER CLAIMS

In their complaint, plaintiffs in No. 90–1616 made a separate claim that the regulations as promulgated would require submission of proprietary data in contravention of the Act. In addition, both sets of plaintiffs challenged the provisions dealing with shucking of surf clams and quahogs at sea. These claims were not addressed in plaintiffs' summary judgment motion,

---

**18.** Plaintiffs' Exhibit B at 12. Indeed, the report notes that "there are several potential biases inherent in the DeLury method, that may produce inflated population size estimates." *Id.* at 7. Plaintiffs also cite the Council's estimate of

the 1990 quahog catch, which shows a short-term decrease in the catch. *Id.* at 12. The Court gives no weight to this data, which does not affect the continued possibility of a long-term increase. *See supra* note 14.

which is styled as a motion for partial summary judgment, or in any of plaintiffs' subsequent memoranda. However, at oral argument, counsel for the plaintiffs abandoned these claims. Accordingly, they will not be addressed by the Court, but will be dismissed along with the other claims.

### III. CONCLUSION

In accordance with this Memorandum Opinion, an Order will be entered granting the defendants' motion for summary judgment and dismissing this case.

### ORDER

Upon consideration of the parties' cross-motions for summary judgment, the opposition and reply memoranda thereto, and the other pleadings and papers filed in these cases, and for the reasons set forth in the Court's Memorandum Opinion of this date, it is hereby

ORDERED, that defendants' motions to dismiss and to strike are DENIED, and defendants' motion for summary judgment is GRANTED. Plaintiffs' motions for summary judgment are DENIED. Accordingly, judgment is hereby entered in favor of defendants, and these cases are dismissed.

IT IS SO ORDERED.