**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

YAKUTAT, INC.,
        *Plaintiff-Appellant,*

v.

CARLOS M. GUTIERREZ,* in his
official capacity as Secretary of
Commerce; DEPARTMENT OF
COMMERCE; NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION;
NATIONAL MARINE FISHERIES
SERVICE,
        *Defendants-Appellees.*

No. 03-35400

D.C. No.
CV-02-01052-BJR

OPINION

Appeal from the United States District Court
for the Western District of Washington
Barbara Jacobs Rothstein, District Judge, Presiding

Argued and Submitted
September 17, 2004—Seattle, Washington

Filed May 18, 2005

Before: James R. Browning, A. Wallace Tashima, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

---

*Carlos M. Gutierrez is substituted for his predecessor, Donald L. Evans, as Secretary of Commerce of the United States, pursuant to Fed. R. App. P. 43(c)(2).

**COUNSEL**

Michael A.D. Stanley, Attorney at Law, Juneau, Alaska, for the plaintiff-appellant.

Sylvia Quast, U.S. Department of Justice, Washington, D.C., Brian C. Kipnis, U.S. Attorney's Office, Seattle, Washington, and Bridget McNeil, U.S. Department of Justice, Washington, D.C., for the defendants-appellees.

## OPINION

BYBEE, Circuit Judge:

The National Marine Fisheries Service ("NMFS") is charged with implementing a licensing program to prevent overfishing of Pacific cod in the Bering Sea and Aleutian Islands ("BSAI") groundfish fishery. The NMFS decided to limit the number of boats fishing in the BSAI fishery by granting licenses only to boats that caught a prescribed amount of fish during any two years between 1995-1998. The *F/V Blue North* caught the requisite amount of fish in 1997 and 1999, but not in the other qualifying years of 1995-96 or 1998. Had the NMFS included 1999 as a qualifying year, the *F/V Blue North* would have qualified to secure a license to fish for Pacific cod in the BSAI fishery.

Yakutat, Inc. is the owner of the *F/V Blue North*. It brought this action to challenge the NMFS's failure to include 1999 as a qualifying year. Yakutat argues that the NMFS's decision is unfair and inequitable under the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson Act"), 16 U.S.C. §§ 1801 *et seq.*, and is arbitrary and capricious, lacking a rational basis under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 501 *et seq.* The district court upheld the decision of the Secretary of Commerce ("Secretary"). Upon review of the record, we conclude that the Secretary's decision to implement the final rule amending the BSAI fishery management plan was neither arbitrary and capricious, nor unfair and inequitable, and that the Secretary articulated a rational basis for the decision. We therefore affirm the judgment of the district court.

## I. FACTS AND PROCEEDINGS

The BSAI fishery, located off the coast of Alaska, is the largest fishery in the United States. *See* 50 C.F.R. § 679.20(a)(1)(i), (2). The BSAI fishery is managed by the

Bering Sea/Aleutian Islands Groundfish Fishery Management
Plan ("FMP"), which is developed by the Northern Pacific
Fishery Management Council ("Council") in accordance with
the Magnuson Act and implemented by the NMFS. *See* 16
U.S.C. § 773c(c); 50 C.F.R. § 679.1.

## A.    *The Regulatory Framework*

In the Magnuson Act, Congress found that "[c]ertain stocks
of such fish have declined to the point where their survival is
threatened," 16 U.S.C. § 1801(a)(2)(A), and established a
national program for the conservation of fishery resources.
Congress stated that this program was "necessary to prevent
overfishing, to rebuild overfished stocks, to insure conserva-
tion, to facilitate long-term protection of essential fish habitats
and to realize the full potential of the Nation's resources." 16
U.S.C. § 1801(a)(6). The purposes of the Magnuson Act
include *inter alia*, providing "fishery management plans
which will achieve and maintain, on a continuing basis, the
optimum yield from each fishery," and establishing "Regional
Fishery Management Councils" that would create, monitor,
and review these Fishery Management Plans. 16 U.S.C.
§ 1801(b)(4), (5). The Magnuson Act provides the Secretary
with fishery management authority within the exclusive eco-
nomic zone[1] of the United States. *See* 16 U.S.C. § 1811(a).

The Secretary carries out his management and conservation
duties through the NMFS and eight Regional Fishery Man-
agement Councils established by the Magnuson Act. 16
U.S.C. § 1852(a). The Northern Pacific Fishery Management
Council covers the states of Alaska, Washington, and Oregon,
and has authority over fisheries in the exclusive economic
zone encompassing the Arctic Ocean, Bering Sea, and the
Pacific Ocean seaward of Alaska. 16 U.S.C. § 1852(a)(1)(G).

---

[1]The exclusive economic zone extends 200 nautical miles seaward from
the territorial coast. *See Exclusive Economic Zone*, *Proclamation No.
5030*, 48 Fed. Reg. 10605 (March 10, 1983).

The Council includes state and NMFS officials, appointed by the Secretary for their expertise regarding the relevant fishery resources. 16 U.S.C. § 1852(b).

The Council is required to prepare Fishery Management Plans and amendments to those plans as necessary for the fisheries in its area. 16 U.S.C. § 1852(h)(1). The Fishery Management Plans must contain conservation and management measures deemed by the Council to be "necessary and appropriate for the conservation and management of the fishery," and must be consistent with the "national standards"[2]

---

[2]The ten national standards in 16 U.S.C. § 1851(a)(1)-(10) are:

(1)   Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

(2)   Conservation and management measures shall be based upon the best scientific information available.

(3)   To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

(4)   Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

(5)   Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(6)   Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7)   Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

described in the Magnuson Act. 16 U.S.C. § 1853(a)(1)(A). The Fishery Management Plan or its amendment must describe the fishery, the vessels involved, the type of gear used, the species of fish involved, and the costs of managing the fishery; it must estimate the maximum and optimum yields and the extent to which the yields will be harvested by U.S. and foreign vessels; it must include measures to minimize bycatch[3] and bycatch mortality; and, to the extent the measures reduce the harvest, it must allocate the restrictions equitably among commercial, recreational and charter fishing sectors. 16 U.S.C. § 1853(a). Any plan or amendment prepared by the Council may "designate zones where, and periods when, fishing shall be limited, or shall not be permitted, or shall be permitted only by specified types of fishing vessels or with specific types of quantities of fishing gear." 16 U.S.C. § 1853(b)(2). The plan or amendment may also "establish a limited access system for the fishery in order to achieve optimum yield" of fishery catches. 16 U.S.C. § 1853(b)(6). If the Council develops a limited access system, it must consider,

---

(8)  Conservation and management measures shall, consistent with the conservation requirements of this Act (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

(9)  Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

(10)  Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

[3]" 'Bycatch' in this context refers to the practice of discarding fish overboard from a fishing boat when, for example, a boat catches more fish than permitted under its quota. Discarded fish often do not survive the trauma associated with being pulled from the depths of the ocean only to be thrown back in." *Natural Res. Def. Council v. Evans*, 316 F.3d 904, 909 n.6 (9th Cir. 2003).

*inter alia*, present participation, historical fishing practices, and cultural and economic considerations. 16 U.S.C. § 1853(b)(6)(A)-(F).

The Magnuson Act directs the Council to establish fishing industry advisory panels "which shall provide information and recommendations on, and assist in the development of," Fishery Management Plans and amendments. 16 U.S.C. § 1852(g)(3)(A). These panels shall be appointed in a manner that provides fair representation of the fishing community and commercial fishing interests in the area. 16 U.S.C. § 1852(g)(3)(B). However, all decisions made by these panels are advisory only, as the Secretary holds ultimate authority regarding the preparation and implementation of Fishery Management Plans and amendments. 16 U.S.C. § 1852(g)(5).

The Council prepares a Fishery Management Plan or an amendment with the input of the advisory panel, and then submits it to the Secretary for review. 16 U.S.C. §§ 1852(h)(1), 1854(a). Upon receipt of the Fishery Management Plan or amendment, the Secretary, through the NMFS, reviews it to determine whether it is consistent with the provisions of the Magnuson Act. 16 U.S.C. § 1854(a)(1). The NMFS places a public notice in the *Federal Register* and a comment period runs for sixty days after publication. *Id.* Within thirty days of the end of the public comment period, the Secretary must approve, disapprove, or partially approve the Fishery Management Plan or amendment. 16 U.S.C. § 1854(a)(3).

Although the Council may also propose and submit implementing regulations with the Fishery Management Plan or amendment, the Secretary must determine whether the proposed regulations are consistent with both the Fishery Management Plan or amendment and the Magnuson Act prior to the public notice and comment period. 16 U.S.C. § 1854(b)(1).

The Secretary also evaluates the consistency of the Fishery Management Plan with six factors that must be taken into account prior to implementing a Fishery Management Plan:

> Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, may . . . establish a limited access system for the fishery in order to achieve optimum yield if, in developing such system, the Council and the Secretary take into account . . .
>
> (A)   present participation in the fishery,
>
> (B)   historical fishing practices in, and dependence on, the fishery,
>
> (C)   the economics of the fishery,
>
> (D)   the capability of fishing vessels used in the fishery to engage in other fisheries,
>
> (E)   the cultural and social framework relevant to the fishery and any affected fishing communities, and
>
> (F)   any other relevant considerations.

16 U.S.C. § 1853(b)(6). The Secretary evaluates proposed regulations immediately upon receipt from the Council, and within fifteen days of initiating this evaluation the Secretary must either publish the regulations for a fifteen to sixty day public comment period or provide recommendations to the Council as to why these regulations are not consistent with the Fishery Management Plan, the amendment, the Magnuson Act, or applicable law. 16 U.S.C. § 1854(b)(1)(A), (B). The Secretary must then promulgate final regulations within thirty days of the end of the public comment period, and "shall consult with the Council before making any revisions to the pro-

posed regulations." 16 U.S.C. § 1854(b)(3). These regulations are to be published in the *Federal Register*, along with "an explanation of any differences between the proposed and final regulations." *Id.* These regulations are subject to judicial review under the APA. 16 U.S.C. § 1855(f).

B.   *The Establishment of the BSAI License Limitation Program*

In 1995, the Council approved a License Limitation Program ("LLP") for vessels operating in federal waters within the BSAI area, slated to begin on January 1, 2000. 50 C.F.R. § 679.4 (establishing the permit system in the BSAI for groundfish fishing). Viewed as the first step in the "Council's commitment to develop a comprehensive and rational management program" for Alaskan fisheries, this LLP limited the number of available licenses to participate in the BSAI groundfish fishery. *Fisheries of the Exclusive Economic Zone Off Alaska; License Limitation Program*, 63 Fed. Reg. 52,642-43 (Oct. 1, 1998) (to be codified at 50 C.F.R. pt. 679) ("*Alaska LLP*"). The Council "intended to design a program that would efficiently manage the resources under its authority, reduce bycatch, minimize waste, and improve utilization" of the resources in the area, especially given the Council's concern that the domestic harvesting fleet had expanded beyond the optimum yield ("OY") of the fisheries in Alaska. *Id.* The Council intended the LLP program to protect fishermen with past dependence on and recent participation in the fisheries, but also desired to rationalize the extent of Pacific cod fishing for more efficient resource allocation. *Id.*

The LLP established eligibility criteria for fishing boats to receive licenses to fish for groundfish or crab. *See* 50 C.F.R. § 679(k)(4) (groundfish) and (k)(5) (crab). The LLP provided two area endorsements[4] within the BSAI groundfish fishery:

---

[4]"Area endorsement means (for purposes of groundfish LLP) a designation on a license that authorizes a license holder to deploy a vessel to conduct directed fishing for license limitation groundfish in the designated area, subarea, or district." 50 C.F.R. 679.2.

The Aleutian Islands and the Bering Sea. *See* 50 C.F.R. § 679.4(k)(4)(ii)(A), (B). The Council did not view the program as an end-all solution to the problem of rationalizing scarce resources. The NMFS recognized it as "an interim step toward a more comprehensive solution to the conservation and management problems of an open access fishery." *Alaska LLP*, 63 Fed. Reg. 52,642-43.

The Alaskan fishing industry expressed concerns about participants jumping from overfished/limited fisheries into other already fully utilized fisheries, despite the introduction of the LLP proposal.[5] *See Fisheries of the Exclusive Economic Zone Off Alaska; Fishing Participation in 1999*, 64 Fed. Reg. 2,870-71 (Jan. 19, 1999) (to be codified 50 C.F.R. pt. 679) *("Alaska Fishing Participation")*. To alleviate these concerns while it considered amendments to the LLP program, the Council notified potential license applicants that participation in a non-salmon[6] fishery in 1999 would not necessarily count as a qualifying year under the proposed rules. *Id*. The Council expressly warned that by publishing this notice it "intended to promote public awareness that potential eligibility criteria for future access to the affected fisheries may be developed and to discourage new entrants into those fisheries based on economic speculation while the Council considers further controls on access to those fisheries." *Id*.

C.  *The Original LLP and Amendment 67*

The original LLP had not classified BSAI groundfish licensees by their use of specific gear or their proposed harvest. Eventually, however, the Council refined its proposed

---

[5]A number of fishery participants leveled specific concerns at crab and pollock licensees entering into the Pacific cod fisheries as crab and pollock resources dwindled.

[6]Pacific cod falls under the "non-salmon" category, and all other fisheries besides salmon in the Northern Pacific Region fall under the jurisdiction of the Council. *See* 16 U.S.C. § 1862(a).

LLP to address the issue of gear and species endorsements for Pacific cod. *See Fisheries of the Exclusive Economic Zone off Alaska; Allocations of Pacific Cod in the Bering Sea and Aleutian Islands Area*, 61 Fed. Reg. 59,029 (Nov. 20, 1996) (to be codified at 50 C.F.R. pt. 679) (implementing Amendment 46 allocating specific allowances for total allowable catch ("TAC") between fixed, trawl, and jig gear) and *Fisheries of the Exclusive Economic Zone Off Alaska; Allocation of Pacific Cod among Vessels Using Hook-and-line or Pot Gear in the Bering Sea and Aleutian Islands*, 65 Fed. Reg. 51,553 (Aug. 24, 2000) (to be codified at 50 C.F.R. pt. 679) (implementing Amendment 64 allocating the fixed gear percentage of Pacific cod TAC among hook-and-line catch processors (freezer longline boats), hook-and-line catcher vessels, pot gear vessels, and fixed gear vessels under 60 feet in length).

Due to concerns "about new participants entering the Pacific cod fisheries and movement of Pacific cod fisherman among the various sectors that use non-trawl gear," the Council also discussed whether it should add Pacific cod endorsements to LLP ground fish licenses, to limit the number of new entrants.[7] *Fisheries of the Exclusive Economic Zone Off Alaska; License Limitation Program for Groundfish of the Bering Sea and Aleutian Islands Area*, 66 Fed. Reg. 49,908-09 (Oct. 1, 2001) (proposed rule and request for comments) ("Proposed Rule"). The Council noted concern that under its preliminary estimates, "about 340 fixed gear catcher vessels and 100 fixed gear catcher/processors would be allowed to target [Pacific] cod in the BSAI under the LLP." The Council considered requiring potential licensees to have minimum catches in 1996-1998 for freezer longline vessels and catcher

---

[7]A LLP allows for general fishing in the BSAI groundfish fisheries, but a Pacific cod endorsement must be attached to the LLP, which will allow Pacific cod fishing using pot or hook-and-line gear. *See The Northern Pacific License Limitation Program, at* http://www.fakr.noaa.gov/ram/llp.htm.

longline vessels, and a host of qualifying year alternatives (such as any three years between 1995-98, any two years between 1995-98, any one year between 1995-98, etc.) with a minimum number of landing requirements for pot gear vessels. The Council also worried that a recent dearth of crab resources in the BSAI created incentives for fishermen using fixed gear[8] to enter the BSAI Pacific cod fisheries, thereby increasing the overfishing of fisheries and an increased Pacific cod catch.[9] *Proposed Rule*, 66 Fed. Reg. at 49,908. The Council stated that it needed "to promote stability in the BSAI fixed gear [non-trawl] cod fishery until comprehensive rationalization is completed." *Id.* The Council urged prompt action and proposed that "a person who holds [a] LLP groundfish license, but who has not participated in the Pacific cod fisheries in the BSAI with non-trawl gear in the past, or who has not participated at a level that could constitute significant dependence on those fisheries," should be prevented from participating in the fisheries. *Id.*

The desire for prompt action resulted in the Council introducing Amendment 67 for the LLP program to establish a license endorsement for Pacific cod. To evaluate proposed Amendment 67, the Council analyzed a number of alterna-

---

[8]Fixed gear vessels are vessels with "fishing gear comprised of lines with hooks attached, including one or more stationary, buoyed, and anchored lines with hooks attached." 50 C.F.R. § 679.2. Longliners are "stationary, buoyed, and anchored groundline with hooks attached, so as to fish along the seabed. It does not include commercial vertical hook-and-line or troll gear." 50 C.F.R. § 660.302. Pot catchers use "pots" which are "baited cages set on the ocean floor to catch fish and shellfish." http://www.st.nmfs.gov/st4/nop/trainingmanuals/West_Coast_Groundfish _Observer_Program_Manual_Part2.pdf, at 5-12. Pot catcher/processors are vessels that can process the catch "on a vessel or other platform that floats" rather than processing the catch back on land. 50 C.F.R. § 660.302. The specifics and distinctions are known to the Secretary, the Council, the NMFS, and the fisherman involved in this litigation.

[9]Besides the "depressed abundance of crab resources," the high value of the Pacific cod catch provided incentives for new participants to enter the field. *Proposed Rule*, 66 Fed. Reg. at 49,908.

tives for licensing fixed-gear vessels[10] in the Pacific cod fisheries. In addition, the Council also considered whether to issue an Environmental Assessment, Regulatory Impact Review, and Initial Regulatory Flexibility Analysis ("EA/ RIR/IRFA") for the Pacific cod license endorsements, and debated over which specific alternatives to include in the report. After deciding to issue the EA/RIR/IRFA, and deciding to include 1999 as one of the alternatives for qualifying years in the report, the Council reaffirmed its December 1998 statement "that landings in 1999 and beyond will not count in qualification for Pacific cod endorsements" under the LLP.

Council staff furnished the EA/RIR/IRFA to the Council in September 1999. The report included analysis of fixed gear vessels in each of the three categories. The report evaluated the number of qualifying freezer longline and catcher longline vessels resulting from three different minimum catch quantities during the years 1996, 1997, and 1998. It also analyzed pot gear vessels under different qualification standards, considering the number of qualifying vessels resulting from requiring either one, two, or three years participation between 1995 and 1998. It further evaluated the number of qualifying vessels resulting from minimum landing requirements between 25,000 and 300,000 pounds.[11] Upon receiving this report, the Council expanded its prior data set and decided to factor 1999 participation into the report it would present at its October 1999 meeting. In addition, the Council also separated categories for pot gear catcher/processor vessels and pot gear catcher vessels so that Council staff could further analyze these categories separately.

The final EA/RIR/IRFA report to the Council contained 106 proposed alternatives (up from its original list of 23 alter-

---

[10]The Council listed freezer longliners, longline catcher vessels, and pot gear vessels as the fixed-gear vessel classes affected by Amendment 67.

[11]Options 1, 2, and 5 considered qualifying years of 1995-1998, while option 3 considered 1995-1997 and option 4 considered 1996-1998.

natives), and less than half (42) of these proposed alternatives included 1999 participation. The Council adopted the final EA/RIR/IRFA for proposed Amendment 67 in March 2000. In the pot gear vessel category, the report contained 10 qualifying year options and 12 qualifying landing catch options.[12] According to analysis provided by Council staff, the factor that would most greatly affect the number of qualifying pot catcher/processor vessels would be the participation years requirement. The EA/RIR/IRFA report noted that the most restrictive alternative for pot catcher/processors would reduce the number of potential pot catcher/processor vessels from 67 to 4, and the most widely considered combination of alternatives generally resulted in between 4 to 20 qualifying vessels.

In addition, during the public comment period, concerned members of the public submitted numerous public statements to the Council urging adoption of stringent catch requirements and standards. Several owners leveled accusations that a number of pot catcher/processor vessels made speculative landings in 1999 in order to qualify for the Pacific cod endorsement. The Council noted these concerns and included them in its decision process regarding the adoption of Amendment 67.

In April 2000, the Council received recommendations from its Advisory Panel and also conducted a public hearing to gather testimony on proposed Amendment 67. The Council also deliberated privately on the inclusion of 1999 as a qualifying year for the pot gear sector, but most of the Council members advocated 1998 as a cutoff date for a number of reasons. After hearing testimony, looking at the public com-

---

[12]The qualification year alternatives ranged from 1995-1999, 1995-1998, 1995-1997, 1996-1998, and 1996-1999, and varied between one, two or three years of participation required within each alternative. The landing requirements ranged from "a landing" (no minimum) to over 300,000 pounds during each or any of the qualifying years, or an aggregate poundage during the qualifying years (between 200,000-600,000 pounds or over 600,000 pounds).

ments, reviewing the recommendations from the Advisory Panel, analyzing the EA/RIR/IFRA from the Council staff and discussing the alternatives in detail, the Council recommended the adoption of Amendment 67. The Amendment 67 recommendation included requiring pot catcher/processor vessels to have landed over 300,000 pounds of Pacific cod in any two years during the 1995-1998 period in order to qualify for a license. The Advisory Panel had also recommended these specific requirements, but it had deliberated between picking option 3 (two years between 1995 and 1998) and option 7A (two years between 1996-1999), before finally choosing option 3.[13]

The Council submitted the revised EA/RIR/IRFA to the Secretary of Commerce for review on July 31, 2000, and detailed the Council's preferred alternative for qualifying pot catcher/processor vessels. It also noted the considerable testimony and public concern that "any serious participant in the P[acific] cod fishery could easily land 300,000 lb in one season, and that allowing a catcher/processor to qualify with any less than that annual harvest level would essentially qualify a number of vessels that participate in the P[acific] cod fishery to supplement the income they receive from their primary fisheries." The Council observed that requiring two out of four years for landing qualification would allow "for legitimate, unanticipated absences from the fishery without penalizing serious participants." It noted that fourteen LLP qualified pot catch/processor vessels in the BSAI groundfish fisheries resulted if the Secretary adopted the qualifying years of 1995-1999, but that nine of those vessels would drop out under the criteria adopted by the Council. The Council

---

[13]The Advisory Panel debated the use of 1999 as a qualifying year. The minority report of the panel states: "The main reason the Council routinely stated that it may not use 1999 for recent participation requirements was the concern that not doing so might lead to speculative landings and increase in the number of licenses. Otherwise recent participation is preferred."

remarked that these nine vessels "reported relatively few P[a-cific] cod landings by comparison over the qualifying 1995-98 time period, seven of which land[ed] P[acific] cod in only one of the qualifying years if at all . . . . This indicates that these vessels were not historically dependent on the P[acific] cod fishery and that the majority of their income likely comes from other fisheries."

D.   *The Final Rule*

After submission of the Council's Amendment 67 recommendation to the Secretary, the NMFS published the notice of availability of proposed Amendment 67. *Fisheries of the Exclusive Economic Zone Off Alaska; License Limitation Program for Groundfish of the Bering Sea and Aleutian Islands Area*, 66 Fed. Reg. 42,833 (Aug. 15, 2001) (notice of availability). It subsequently proposed Amendment 67 as a final rule, and requested public comment. *Proposed Rule*, 66 Fed. Reg. 49,908. Following public comment period, the Secretary published the Final Rule in the *Federal Register*, and explained the rule while addressing public concerns raised during the comment period. *Fisheries of the Exclusive Economic Zone Off Alaska; License Limitation Program for Groundfish of the Bering Sea and Aleutian Islands Area*, 67 Fed. Reg. 18,129-40 (Apr. 15, 2002) (final rule) ("Final Rule").

The Secretary explicitly addressed the concern in the Final Rule that "[t]he standards used to determine eligibility for a Pacific cod permit were not fair and equitable, in violation of national standard 4, because different requirements were used for different methods of catching Pacific cod." *Id.* at 18,134. The Secretary explained that "the Council, through Amendment 67, was trying to achieve a level of participation that reflected historical participation patterns for each of the sectors." *Id.* With respect to the pot catcher/processor sector, the Secretary noted that this sector did not have a long and consistent history and that significant variance in the composition

of qualifying vessels occurred depending on which years and qualifying catches the Council considered. *Id.* "[T]he Council chose eligibility criteria that would decrease the number of participants . . . intend[ing] to ensure that vessels in the sector that had historical and consistent participation based on the Council's analysis of the available data would be allowed to continue to participate at a level that reflected what the Council determined to be economic dependence." *Id.*

E.    *Yakutat, Inc.*

Yakutat, Inc. currently operates the *F/V Blue North* in the BSAI groundfish fishery, and has operated in the area since 1994. The *F/V Blue North* originally operated as a freezer longliner, but converted to a combination pot catcher/ processor and freezer longliner in December of 1996. The *F/V Blue North* fished using its longliner capabilities until reaching its allotted limit in May 1997, and it then utilized pot gear for the rest of the year, landing more than 300,000 pounds of Pacific cod in 1997. In 1998, the *F/V Blue North* did not fish using pot gear, solely utilizing its longliner equipment the entire season.[14] In 1999, the *F/V Blue North* landed more than 300,000 pounds of Pacific cod using pot gear after reaching its seasonal apportionment using longliner gear. Upon publication of the Final Rule, the NMFS deemed the *F/V Blue North* ineligible for a pot catcher/processor Pacific cod endorsement because its 300,000 pounds catch landing occurred in only one of the qualifying years between 1995-1998. Yakutat currently holds a BSAI pot catcher/processor endorsement pending its "unavoidable circumstances" exception claim under 50 C.F.R. § 679.4(k)(9)(v)(B).[15]

---

[14]Yakutat notes that it placed the vessel in shipyard maintenance repair in June and July 1998. However, it did fish continuously from December 1996 until June 1998, and then resumed operations from September to December 1998. It states that it only relied on its longliner capabilities during 1998.

[15]Yakutat requested that the NMFS credit it with participation in 1998, notwithstanding that it does not otherwise qualify, based on "unavoidable

F.   *Proceedings Below*

On May 12, 2002, Yakutat sought district court review of the Secretary's Final Rule. Yakutat argued that the Final Rule violated national standards created by the Magnuson Act, was arbitrary and capricious in violation of the APA, and denied equal protection of the laws guaranteed by the Fifth Amendment. The district court granted the Secretary's summary judgment motion and dismissed Yakutat's claims.

Yakutat appeals the district court's judgment, claiming that the district court erred in granting the Secretary's summary judgment motion, and reiterates its original claims.[16] First, Yakutat argues that the Secretary's failure to include 1999 as a qualifying year for pot catcher/processors violated the Magnuson Act and the APA because the Secretary and Council failed to articulate a justification for the exclusion. Second, Yakutat claims that the exclusion of 1999 as a qualifying year is unfair and inequitable, and lacks a rational basis, thereby violating the Magnuson Act and the APA. Yakutat requests that this Court overturn the district court's grant of summary judgment in favor of the Secretary.

---

circumstances." 50 C.F.R. § 679.4(k)(9)(v)(B)(1)-(4) (a claimant must show the vessel was "lost, damaged, or otherwise unable to participate in the license limitation groundfish" fishery to receive credit for "unavoidable circumstances"). The NMFS denied the claim on March 27, 2003, and Yakutat appealed to the NMFS Office of Administrative Appeals on May 27, 2003. If successful, Yakutat will be credited with participation for 1998 and would be eligible for the Pacific cod endorsement. Neither party, however, seeks to have the Court wait until the NMFS decides Yakutat's appeal to decide this issue, although a favorable decision to Yakutat would, presumably, moot Yakutat's claim and the *F/V Blue North*'s would receive a Pacific cod pot catcher/processor endorsement.

[16]Yakutat does not, however, appeal their equal protection claim to this Court.

## II.   STANDARD OF REVIEW

This Court reviews a district court's decision to grant summary judgment *de novo* with all facts read in the light most favorable to the non-moving party. *Covington v. Jefferson County*, 358 F.3d 626, 641 n.22 (9th Cir. 2004). In reviewing regulations promulgated under the Magnuson Act, we have held that "our only function is to determine whether the Secretary [of Commerce] 'has considered the relevant factors and articulated a rational connection between the facts found and the choice made.' " *Alliance Against IFQs v. Brown*, 84 F.3d 343, 345 (9th Cir. 1996) (quoting *Wash. Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438, 1440-41) (9th Cir. 1990)). "We determine only if the Secretary acted in an arbitrary and capricious manner in promulgating such regulations." *Alliance Against IFQs*, 84 F.3d at 345. Similarly, when reviewing administrative actions taken under the APA, the panel may reverse the agency action only if the action is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. *See* 5 U.S.C. § 706(2); *Lands Council v. Powell*, 379 F.3d 738, 743 (9th Cir. 2004), *amended by* 395 F.3d 1019 (9th Cir. 2005).

## III.   DISCUSSION

Yakutat makes two claims on appeal: First, Yakutat argues that the Secretary's failure to include 1999 as a qualifying year for pot catcher/processors is arbitrary and capricious, in violation of both the Magnuson Act and the APA, because the Secretary and Council failed to articulate a justification for the exclusion. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1853(b)(6). Second, Yakutat claims the exclusion of 1999 as a qualifying year is unfair and inequitable in violation of the Magnuson Act, and lacks a rational basis, in violation of the APA. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1851(a)(4). We review each in turn.

A.   *The Final Rule Was Not Arbitrary and Capricious*

Yakutat claims that the Council and the Secretary (through NMFS) must articulate a rational connection between the facts found and the Final Rule. Yakutat alleges that this obligation is expressed in National Standard 4 of the Magnuson Act. National Standard 4 reads:

> (4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1851(a)(4).

Yakutat argues that failure to comply with National Standard 4 or to articulate a motive for a particular allocation violates the Magnuson Act. Yakutat also argues that the Secretary's actions are arbitrary and capricious because he has not supplied a rational connection between the facts and the Final Rule.

[1] The record demonstrates the Secretary's concern "to conserve and manage the Pacific cod resources" and "stabilize fully utilized Pacific cod resources" being harvested in the BSAI. *Final Rule*, 67 Fed. Reg. at 18,129. The Secretary also noted concern to protect fishermen with significant long-term investments and long catch histories in the pot catcher/ processor sector. *Id.* at 18,130. The Secretary and Council fully evaluated all of the alternatives available to them, which included numerous alternatives that included 1999 as a qualifying year. The Council produced the final EA/RIR/IFRA,

which specifically included analysis of 42 out of 106 alternatives with 1999 as a qualifying year for pot catcher/processors. Based on the data before the Council, it chose to not include 1999 as a qualifying year because those boats that dropped out when 1999 was not included "were not historically dependent on the Pacific cod fishery and [ ] the majority of their income likely [came] from other fisheries." In accordance with public testimony, industry experience, and data analysis, the Council decision established a standard for measuring historical dependence, and drew a rational line. The Secretary, utilizing the same data and reports provided by the Council, adopted the Council's recommendation. The record clearly provides a rational basis on which the Secretary based his decision.

**[2]** Agency actions may also be found to be arbitrary and capricious "if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of the agency's expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). *See also* 5 U.S.C. § 706(2); *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 590 (9th Cir. 1998) (rejecting an arbitrary and capricious claim against the NMFS because the NMFS provided rational reasons for the action taken). "Controlling precedent requires that a plan not be deemed arbitrary and capricious, 'even though there may be some discriminatory impact,' if the regulations 'are tailored to solve a gear conflict problem and to promote the conservation of' " the fish in question. *Alliance Against IFQs*, 84 F.3d at 350 (quoting *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir. 1987)). As long as the Secretary considered the fishermen's interests, and "considered the relevant factors and articulated a rational connection between the facts found and the choice made," the Secretary's decision will not lack a rational basis. *Wash. Crab Producers, Inc.*, 924

F.2d at 1441. *See also Alliance Against IFQs*, 84 F.3d at 350. We conclude that the Secretary has not run afoul of these considerations.

**[3]** First, neither the Secretary, nor the Council, relied on factors that Congress did not intend the agency to consider. The Secretary must take into account six factors for implementing any Fishery Management Plan or amendments to a Fishery Management Plan.[17] *See* 16 U.S.C. § 1853(b)(6); *Alliance Against IFQs*, 84 F.3d at 346. The Council explicitly looked at all of these factors, including historical fishing practices and dependence on the fishery, economics of the fishery, capability of fishing vessels to engage in other fisheries, other relevant considerations, and also analyzed present participation in the fishery. The only factor not explicitly examined in the record is the cultural and social framework relevant to the fishery. However, this is not fatal to the Secretary and Council's decision. *See Alliance Against IFQs*, 84 F.3d at 347 (stating that Congress left the Secretary some room by not defining such terms as "present participation" and determining that each factor is "one of many factors which the Council and Secretary must 'take into account' ").

**[4]** Second, 16 U.S.C. § 1851(a) requires any Fishery Management Plan to comply with ten national standards.[18] The Secretary's comments in the Final Rule explicitly respond to public comments regarding alleged violations of National Standards 1, 2, 3, 4 (twice), 5, 6, 7, 8, 9, and 10. *See Final Rule*, 67 Fed. Reg. at 18,133-136. The Secretary's response to these public comments shows that he considered all of these national standards in analyzing and constructing the Final Rule. *Id.* There is no evidence that the Secretary relied on factors Congress did not intend, and it is clear that the Secretary and Council made every effort to comply with all of the options required by Congress.

---

[17]*See supra* at 5310.

[18]*See supra* at 5307-08 n.2.

**[5]** Third, the Secretary did not fail to consider an important aspect of the agency action because he analyzed the Council recommendation *and* independently considered including 1999 as a qualifying year. *See Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43. The inclusion of 1999 was one of many factors considered by the Secretary, as well as by the Council, and both considered including 1999 as a qualifying year before choosing to emphasize issues implicating other factors more relevant to the problem statement and overall goal of the FMP.

**[6]** Finally, the Secretary neither offered an explanation for his decision that runs counter to the evidence, nor acted in a manner that could not be ascribed to agency expertise. The Secretary specifically responded to public comments about the decision in the *Federal Register*, and explained the rationale behind treating pot catcher/processor vessels differently than other vessels. *Final Rule*, 67 Fed. Reg. at 18,134. In addition, the Council, with its expertise and industry experience, deliberated over the Amendment for over 45 hours, heard public testimony, received public comments, and read staff reports and analysis prior to making its recommendation to the Secretary. The Secretary analyzed these same reports, received public comments, and responded publically to those comments in making his decision. There is nothing in the evidence that suggests that the Secretary, or the Council, acted in manner that could not be ascribed to agency expertise.

B. *The Final Rule Is Neither Unfair or Inequitable*

Yakutat argues that the exclusion of 1999 from the pot catcher/processor vessel criteria is unfair and inequitable because it violates the Magnuson Act by not taking recent participation into account as required by 16 U.S.C. § 1853(b)(6), and because it violates National Standard 4, 16 U.S.C. § 1851(a)(4). Specifically, Yakutat asserts that the Final Rule does not comply with the requirement that fishing allocations be "fair and equitable" because the endorsement

requirements for pot catcher/processors do not extend to include participation in 1999. *See* 16 U.S.C. § 1851(a)(4) ("If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen . . . .").

### 1.   The Secretary Took Present Participation Into Account

Yakutat argues that by not including 1999 as one of the qualifying years in the Final Rule, the NMFS and the Secretary violated 16 U.S.C. § 1853(b) because "present participation" is thereby not included in the Final Rule. The statute reads: "Any [Fishery Management Plan] which is prepared by any Council, or by the Secretary, with respect to any fishery, may . . . establish a limited access system for the fishery in order to achieve Optimum Yield if, in developing such a system, the Council and the Secretary take into account (A) present participation in the fishery, [and] (B) historical fishing practices in, and dependence on, the fishery . . ." *Id*. Aside from these factors, there are four other factors that must be considered, including the economics of the fishery, the cultural and social framework relevant to the fishery, the capability of fishing vessels used in the fishery to engage in other fisheries, and "other relevant considerations." *Id*.

We previously dealt with similar claims in *Alliance Against IFQs v. Brown*, 84 F.3d 343. In *Alliance Against IFQs*, the NMFS implemented regulations for a Fishery Management Plan regarding sablefish and Pacific halibut, assigning quota shares based on participation in landings in 1984-90. NMFS implemented the Final Rule in 1993, and the plaintiffs, a number of concerned fishermen, argued that the Final Rule violated the "present participation" requirement of the Magnuson Act by not taking into account participation in fishing during 1991-93. *Id*. at 346. We concluded that the Secretary had good reason for not including 1991-93 in the qualifying years for a rule issued in 1993: the industry knew that a rule was under consideration and recent fishing history might have

skewed the data. *Id*. at 346-47. As we explained: "[I]f participation in the fishery while the rule was under consideration had been considered, then people would have fished and invested in boats in order to obtain quota shares, even though that would have exacerbated overcapacity and made no economic sense independently of the regulatory benefit." *Id*. at 346. We held that we could not "characterize use of a 1988 through 1990 period as so far from 'present participation' when the regulation was promulgated in 1993 as to be 'arbitrary and capricious.' " *Id*. at 348 (citing *Wash. Crab Producers, Inc*., 924 F.2d at 1441).

In the instant case, the Council noted a similar concern regarding "present participation" while it debated the specifics of the Final Rule to present to the Secretary. The Council gave notice that 1999 might not qualify in order "to discourage new entrants into those fisheries based on economic speculation while the Council considers further controls on access to those fisheries." *Alaska Fishing Participation*, 64 Fed. Reg. at 2,870. These concerns were not imagined. The data showed a jump in participation by pot catcher/processor vessels during 1999 from crabbing to Pacific cod fishing. Nevertheless, the Council did not reject 1999 out of hand, but still considered whether 1999 should be a qualifying year. *Alaska Fishing Participation*, 64 Fed. Reg. at 2,870. The Council actually considered 106 alternatives, of which 42 included 1999 as a qualifying year. Even when the Council submitted its preferred alternative, which did not include 1999 as a qualifying year, the Council advised the Secretary of other options, which included proposals to make 1999 a qualifying year. In the end, the Secretary adopted the Council's recommendations, published the Final Rule and responded to comments regarding the "different requirements used for different methods of catching Pacific cod." *Final Rule*, 67 Fed. Reg. at 18,134.

**[7]** Present participation is only one of six factors that must be taken into account when promulgating a new rule for Fish-

ery Management Plans. *Alliance Against IFQs*, 84 F.3d at 347 ("Congress left the Secretary some room for the exercise of discretion, by not defining 'present participation,' and by listing it as *only one of many factors* which the Council and the Secretary must 'take into account.' " (emphasis added)). The Secretary exercised the discretion granted him in the Act by concluding that a cut-off date was essential for the Final Rule's treatment of pot catcher/processor vessels. The Secretary's decision to reject the most recent year in favor of a cumulation of the other five factors that also must be considered, is reasonable and consistent with our precedent. *Alliance Against IFQs*, 84 F.3d at 348. We conclude that the Secretary had a rational basis for not allowing "present participation" in the form of including 1999 to take precedence over other relevant factors under consideration in crafting the FMP amendment.

## 2. The Final Rule Does Not Violate National Standard 4

**[8]** Yakutat argues that not including 1999 in the FMP as a qualifying year is unfair and inequitable in contravention of National Standard 4. National Standard 4 provides: "Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such a manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges." 16 U.S.C. § 1851(a)(4). *See also* 50 C.F.R. § 600.325(c)(3)(i).[19] In *Alli-*

---

[19]The NMFS guidelines for National Standard 4 state: "The motive for making a particular allocation should be justified in terms of the objectives of the FMP; otherwise the disadvantaged user groups or individuals would suffer without cause." 50 C.F.R. § 600.325(c)(3)(i)(A). *Accord* 50 C.F.R. § 600.325(c)(3)(i)(B) ("An allocation of fishing privileges may impose a hardship on one group if it is outweighed by the total benefits received by another group or groups. An allocation need not preserve the status quo in the fishery to qualify as "fair and equitable," if a restructuring of fishing privileges would maximize overall benefits.").

*ance Against IFQs*, we noted that there is tension "between fairness among all fishermen, preventing overfishing, promoting efficiency, and avoiding unnecessary duplication, [which] necessarily requires that each goal be sacrificed to some extent to meet[ ] the others." *Alliance Against IFQs*, 84 F.3d at 349. "The Secretary is allowed, under this authority, to sacrifice the interests of some groups of fishermen, for the benefit as the Secretary sees it of the fishery as a whole." *Id.* at 350 (citing *Alaska Factory Trawler*, 831 F.2d at 1460).

Yakutat argues that the FMP amendment qualified two boats that have clearly abandoned the fishing industry, while it excludes the *F/V Blue North*, thereby demonstrating the unfairness of the qualifying criteria. Yakutat contends that the Council should have used base years 1996-99 as qualifying years, which would include the *F/V Blue North*, and preclude the qualification of other boats that have qualified for the Pacific cod endorsement under the current regime.

The Secretary and the Council addressed directly the issues raised by Yakutat, and examined the use of 1999 as a qualifying year for pot catcher/processors. The Council explained that it did not include 1999 in its final recommendation "to ensure that vessels in the sector that had historical and consistent participation based on the Council's analysis of available data would be allowed to continue to participate at a level that reflected what the Council determined to be economic dependence." *Final Rule*, 67 Fed. Reg. at 18,134.

[9] Congress requires the Secretary to exercise discretion and judgment in weighing the national standards in 16 U.S.C. § 1851, and the Secretary need only provide "a reason for doing that which was consistent with the statutory standards." *Alliance Against IFQs*, 84 F.3d at 350. The Secretary, through the Council, drafted a problem statement in June 1999 stating his intent to remedy problems relating to the protection of dependent fishermen and promotion of stability and rationalization of a fully utilized resource. This statement noted:

"Longline and pot fishermen who have made significant long-term investments, have long catch histories and are significantly dependent on the BSAI cod fisheries need protection from others who have little or limited history and wish to increase their participation in the fishery." *Fisheries of the Exclusive Economic Zone Off Alaska; Allocation of Pacific Cod Among Vessels Using Hook-and-line or Pot Gear in the Bering Sea and Aleutian Islands*, 65 Fed. Reg. 51,554 (Aug. 24, 2000). The Council analyzed the individual catch histories and reliance upon the Pacific cod fisheries utilizing specific gear assignments and landing quantities, ultimately agreeing on a "break even" point for economic dependence and sending its recommendation to the Secretary with the EA/RIR/IFRA.

The Council thoroughly investigated the inclusion of 1999 as a qualifying year for pot catcher/processor vessels, but concluded that inclusion would not benefit those with significant historical dependence on the Pacific cod industry. The Council found that "under the Council's preferred alternative, approximately 9 vessels that landed P[acific] cod in the BSAI in 1995-99 would no longer be allowed in the fishery. . . . The 9 vessels that drop out reported relatively few P[acific] cod landings by comparison over the qualifying 1995-98 time period, seven of which landed P[acific] cod in only one of the qualifying years if at all. . . . This indicates that these vessels were not historically dependent on the P[acific] cod fishery and that the majority of their income likely comes from other fisheries."

**[10]** Yakutat argues that the Council's lack of serious deliberation to include 1999 as a qualifying year tainted the decision, but Yakutat must demonstrate something more than the fact that the Secretary allegedly did not give the decision the consideration Yakutat would have liked. *See Alaska Factory Trawler*, 831 F.2d at 1460 ("In order for a court to overturn a *Secretary's* decision, it must be shown that alleged irregularities . . . affected such decision." (emphasis added)). There-

fore, in order to overturn a decision, plaintiffs must demonstrate irregularities in the Secretary's actions or show that the Secretary followed incorrect procedures. *Id.* The record does not support Yakutat's claims. The Council provided the Secretary with the EA/RIR/IFRA and its recommendations from the Council, and the Secretary viewed all 106 proposed alternatives prior to making his decision. The Secretary possessed the entire record while making his decision, and this record demonstrated that the Council's proposed alternative for Amendment 67 would achieve the goal of protecting fishermen with significant long-term investments and long catch histories.

[11] The Secretary's decision directly correlates with the Council-issued statement in 1999 announcing the development of the FMP amendment.[20] Since both the Council and the Secretary considered both historical dependence *and* consistent participation in the industry while constructing the FMP amendment, we cannot find the result unfair and inequitable. The Council and Secretary analyzed the 106 alternatives for pot catcher/processors, and ultimately decided that including 1999 as a qualifying year would not reflect historical and consistent participation or economic dependence. Consistent with his responsibility to preserve the BSAI fishery, the Secretary properly took into account "[o]vercapitalization, excess harvest capacity, and economic waste in a fishery" in order to conserve and maintain fishing levels without hurting long-time participants. *Final Rule*, 67 Fed. Reg. at 18,135.

_____

[20]"The Council intends to address whether and how to further limit access to the non-salmon fisheries under its authority. . . . [and] the Council [is] to recommend to NMFS, by July 1, 1999, conservation and management measures to prevent Bering Sea pollock fishing operations from exceeding in the aggregate the traditional harvest levels of those fishing operations. . . . This document is intended to discourage speculative entry into the non-salmon fisheries while potential management regimes [such as amendment 67] to further control access to those fisheries are discussed and possibly developed by the Council." *Alaska Fishing Participation*, 64 Fed. Reg. at 2,871.

Ultimately, the Secretary had to draw a line because of the overall number of pot catcher/processors and the number of vessels that would qualify based on the various criteria considered. Unlike the long and consistent history of fishing by the hook-and-line and pot gear vessels, pot catcher/processors had only a relatively recent history, with a number of boats jumping in and out of the fishery. Therefore, the Secretary and Council drew a line based on all the relevant information and alternatives available at the time, and they offered a rational reason for this line in their response to public comments. *See Final Rule*, 67 Fed. Reg. at 18,135. Basing his conclusions on the EA/RIR/IFRA which laid out all of the viable alternatives for pot catcher/processors, the Secretary made a rational decision to limit the number of newer participants and draw a line for qualifying years.

**[12]** When the administrative agency has provided relevant data supporting its decision, we owe deference to the agency's line-drawing. *See Natural Res. Def. Council v. EPA*, 966 F.2d 1292, 1306 (9th Cir. 1992) ("Without data supporting the [agency action], we owe no deference to EPA's line-drawing. We thus hold that EPA's [action] is arbitrary and capricious . . . ."). As such, not including 1999 as a qualifying year based on all of the relevant analysis and record available is neither unfair or inequitable, nor is it arbitrary and capricious. *See Leather Indus. of Am., Inc. v. EPA*, 40 F.3d 392, 409 (D.C. Cir. 1994) ("Where the agency's line-drawing does not appear irrational and the [plaintiff] has not shown that the consequences of the line-drawing are in any respect dire . . . we will leave that line drawing to the agency's discretion.").

**[13]** The Secretary placed a higher premium on historical participation and significant dependence, instead of focusing solely on present participation. The Secretary determined that by limiting entry of newer fishing vessels while assuring continued participation of historically dependent fishermen, the FMP amendment would conserve the fishery by reducing overcapitalization. *Final Rule*, 67 Fed. Reg. at 18,129, 18,134.

The record provides a rational basis for the Secretary's decision, and the Final Rule did not violate National Standard 4.

## IV. CONCLUSION

The Secretary's Final Rule for the BSAI FMP does not violate the Magnuson Act or the Administrative Procedure Act. The Final Rule is neither arbitrary and capricious, nor unfair and inequitable. We therefore affirm the ruling of the district court.

AFFIRMED.